UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| RENITA BELTON and MATTHEW ERICKSON on behalf of themselves and all those similarly situated, | : : : | |
| | : | Civil Action File No. |
| Plaintiffs, | : | |
| | : | 1:10-CV-0583-RWS |
| vs. | : | |
| | : | |
| STATE OF GEORGIA, et. al | : | **CLASS ACTION** |
| | : | |
| Defendants. | : | |

---

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF LIABILITY

COME NOW Plaintiffs Renita Belton ("Belton") and Matthew Erickson ("Erickson") (collectively "Plaintiffs"), on behalf of themselves and as class representatives of the certified class, and file this *Motion for Summary Judgment on the Issue of Liability* ("Motion").

Plaintiffs seek an order of summary judgment in their favor as to the issue of the liability of the State of Georgia ("State") to the Plaintiffs and their fellow class members under Title II of the Americans with Disabilities Act and the Rehabilitation Act.

In support of their Motion, Plaintiffs rely upon the accompanying *Brief in Support of Plaintiffs' Motion for Summary Judgment on the Issue of Liability*, *Statement of Material Facts as to Which There is No Genuine Dispute* (Attachment 1), Affidavit of Steven Hamerdinger (Attachment 2), Defendants' Responses to Plaintiffs' First Interrogatories (Attachment 3), Department of Behavioral Health and Developmental Disabilities Program Budget Financial Summary (Attachment 4), Affidavit of Gale Belton (Attachment 5), and Affidavit of Melissa Boggess (Attachment 6).

Plaintiffs' further rely on the depositions of Charlie Bliss, Barry Critchfield, Beverly Rollins, Frank Shelp, Linda Smith, Audrey Sumner, and Anne Tria, the original transcripts of which Plaintiffs have transmitted to the Court for filing.

WHEREFORE, for the reasons set forth in the accompanying Brief, Defendants pray that this Court GRANT their *Motion for Summary Judgment on the Issue of Liability.*

Respectfully submitted.

[SIGNATURES ON FOLLOWING PAGE]



A. Lee Parks
Georgia Bar No. 563750
lparks@pcwlawfirm.com
David F. Walbert
Georgia Bar No. 730450
dwalbert@pcwlawfirm.com
James Radford, Jr.
Georgia Bar No. 108007
jradford@pcwlawfirm.com
Joshua Capilouto
Georgia Bar No. 778707
jcapilouto@pcwlawfirm.com

PARKS, CHESIN & WALBERT, P.C.
75 Fourteenth Street – 26TH Floor
Atlanta, Georgia 30309
Telephone: (404) 873-8000
Facsimile: (404) 873-8050

## **CERTIFICATE OF SERVICE**

  I certify that this *Plaintiffs' Motion for Summary Judgment on the Issue of Liability* is written in Time New Roman, 14 pt. font, in compliance with the Local Rules of this Court. I further certify that on June 20, 2011, I served all parties in this matter with *Plaintiffs' Motion for Summary Judgment on the Issue of Liability* by filing it with the Court's electronic filing and service system (CM/ECF), which shall provide electronic service to the following:

     Penny Hannah   Jason Naunas

_____
A. Lee Parks
Georgia Bar No. 563750
lparks@pcwlawfirm.com

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| RENITA BELTON and MATTHEW ERICKSON on behalf of themselves and all those similarly situated, | : : : | |
| | : | Civil Action File No. |
| Plaintiffs, | : | |
| | : | 1:10-CV-0583-RWS |
| vs. | : | |
| | : | |
| STATE OF GEORGIA, et. al | : | **CLASS ACTION** |
| | : | |
| Defendants. | : | |

---

## PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF LIABILITY

COME NOW Plaintiffs Renita Belton ("Belton") and Matthew Erickson ("Erickson") (collectively "Plaintiffs"), on behalf of themselves and as class representatives of the certified class, and file this *Brief in Support of their Motion for Summary Judgment on the Issue of Liability* ("Motion").

## I.     BACKGROUND

This case arises out of the protracted failure by the State of Georgia (the "State") to make its public mental health services[1] accessible to deaf persons, as

---

[1] "Mental health services" is used here to include services for mental illness, developmental disability, and addiction.

required by Title II of the Americans with Disabilities Act ("Title II" or "ADA") and Section 504 of the Rehabilitation Act ("Section 504"). This Court has previously certified this case as a class-action on behalf of "all deaf Georgia citizens who are, or will be in need of public mental health services, but who cannot receive therapeutic benefit from said services due to the Georgia Department of Behavioral Health and Developmental Disabilities' ["DBHDD"] lack of accommodations for the Deaf." (Doc. 82 at 1).

Based on the overwhelming body of evidence obtained through discovery, the State cannot make a good faith argument that deaf Georgians currently have equal access to the therapeutic benefits of DBHDD's public mental health services. To the State's credit, its own expert witness, Dr. Barry Critchfield ("Critchfield"), has admitted that the Plaintiff class is entitled to relief. Specifically, Critchfield has conceded that DBHDD presently has no viable deaf services program in place; that the lack of funding for deaf services has created a severe shortfall of mental health clinicians who are fluent in American Sign Language (ASL); that there are few to no group home arrangements appropriate for deaf Georgians; that the State's practice of refusing to adequately reimburse medical providers for the costs of interpreting services causes these providers to decline to treat deaf persons; and that, as a result, deaf Georgians do not have equal access to the therapeutic benefits

of the State's public mental health care services. Critchfield's expert testimony is corroborated by the testimony of numerous DBHDD officials, who frankly agree with the Plaintiffs that the resources dedicated to deaf services are inadequate and deny deaf persons equal access to DBHDD assistance. The legal inadequacies of Georgia's public mental healthcare services for deaf Georgians is also confirmed by the Plaintiffs' expert, Steven Hamerdinger ("Hamerdinger"), as outlined in his affidavit, which is submitted in support of this Motion. (Attachment 2).

Based on the record evidence submitted in support of this Motion, and the applicable statutory and case law, there is no genuine issue of material fact or law that would preclude the grant of summary judgment on the issue of the State's liability under the ADA and Rehabilitation Acts.

## II.    FACTS

The facts that are material to the Motion are set forth in *Plaintiffs' Statement of Material Facts to Which There is no Genuine Dispute* ("Plfs. SMF") (Attachment 1). The individual experiences of the class representative Plaintiffs and their families to obtain much needed public mental health services from the State are briefly summarized here. The Plaintiffs' personal experiences tell the story of all deaf Georgians in need of equal access to DBHDD's public services, which the ADA and the Rehabilitation Act guarantees to all disabled citizens.

DBHDD is the state agency with primary responsibility to administer state-funded services for mental illness, developmental disabilities, and addictive diseases. (Deposition of Frank Shelp ("Shelp Dep.") at 32-33). DBHDD currently provides services to over 85,000 adults and 20,000 children and adolescents with mental health, developmental disability, and addictive diseases-related needs. (Defendants' Responses to Plaintiffs' First Interrogatories, Attachment 3, at ¶¶ 1-3). DBHDD's fiscal year 2010 budget was over $1.13 billion. (Attachment 4, DBHDD Program Budget Financial Summary).

Plaintiffs Belton and Erickson are deaf. They depend on American Sign Language ("ASL") as their primary method of communication. (Affidavit of Gale Belton ("Belton Aff."), Attachment 5, at ¶ 3; Affidavit of Melissa Boggess ("Boggess Aff."), Attachment 6, at ¶ 4). Belton has been diagnosed with several mental disorders and developmental disabilities, including Major Depression, Obsessive Compulsive Disorder, Mild Mental Retardation, and Mitochondrial Disorder. (Belton Aff. at ¶¶ 3-4). Belton's most serious and urgent need of behavioral health services is related to her depression. She has been hospitalized several times for suicidal behaviors. She requires 24-hour "awake" supervision due to the risk of harm she poses to herself and to others. (Id. at ¶ 4). Erickson has been diagnosed with Bipolar Disorder, Obsessive Compulsive Disorder, Asperger

syndrome, Oppositional Defiance Disorder, and Pervasive Development Disorder Spectrum, and needs constant supervision. (Boggess Aff. at ¶ 4).

Gale Belton ("Gale") is Belton's mother. As set forth in detail in Plaintiffs' Statement of Material Facts, Gale continues to go through a protracted and largely unsuccessful struggle to secure much needed public mental health services for her daughter, due primarily to her daughter's deafness. (Plfs. SMF at ¶¶ 4-22). The Belton family was repeatedly denied access to public health services, including long term placement in a residential group home appropriate for deaf patients, due to state-contracted providers' inability to care for a deaf client, for whose services the state did not dedicate funding. (Id.). Plaintiff Erickson's family, like Belton's has had substantial difficulty in locating a deaf-appropriate group home to care for their son despite the approval by DBHDD of funding for general mental health services. (Id. at ¶¶ 29-32).

As set forth in detail *infra*, the undisputed evidence demonstrates that the Plaintiffs' inability to access DBHDD's services on an equal playing field with hearing persons is due to a number of institutional failures by the State to make its programs available to deaf persons.

### III.  ARGUMENT AND CITATION TO AUTHORITY

### A. <u>**Standards for Summary Judgment**</u>

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "The moving party bears 'the initial responsibility of informing the … court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" <u>Hickson Corp. v. N. Crossarm Co.</u>, 357 F.3d 1256, 1259 (11th Cir. 2004) (alteration in original) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)) (internal quotation marks omitted). Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S.242, 257 (1986) ("[T]he [non-movant] must present affirmative evidence in order to defeat a properly supported motion for summary judgment.").

The applicable substantive law identifies which facts are material. <u>Id.</u> at 248. A fact is not material if a dispute over that fact will not affect the outcome of the

suit under the governing law. Id. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249–50.

**B. Legal Requirements of the ADA and Rehabilitation Act**

Both Title II of the ADA ("Title II") and § 504 of the Rehabilitation Act prohibit discrimination on the basis of disability in the delivery of public services. Title II applies only to public entities, whereas the Rehabilitation Act proscribes discrimination in all federally-funded programs. Title II provides:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.

Similarly, the Rehabilitation Act provides:

> No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance [. . .].

29 U.S.C. § 794(a).

The Department of Justice has implemented regulations to enact the ADA and Rehabilitation Act. These regulations have the force of law. United States v.

Morton, 467 U.S. 822, 834, 104 S.Ct. 2769, 2776 (1984). The regulations, provide, in pertinent part, that a public entity shall not:

(i) Deny a qualified individual with a disability the opportunity to participate in or benefit from [an] aid, benefit, or service;

(ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit or service *that is not equal to that afforded others*;

(iii) Provide a qualified individual with a disability with an aid, benefit or service *that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others*; [or]

(vii) Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

28 C.F.R. § 35.130(b)(1) (emphasis added).

The succeed on a claim under Title II, a Plaintiff must prove: (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability. Bircoll v. Miami-Dade County, 480 F.3d 1072, 1083 (11th Cir. 2007); See also Lovell v. Chandler, 303 F.3d 1039, 1052 (9th Cir. 2002) (applying same test to state-wide class of disabled persons excluded from state Medicaid

program).[2]

**C. The Evidentiary Record Establishes that Deaf Persons in Georgia do not Have Equal Access to the Services of the Same Quality as those Available to Hearing Persons.**

As an initial matter, it is important to note that federal courts at every level have consistently held state and local governments liable under Title II where public services are operated in a manner that discriminates against individuals with disabilities. See, e.g. Olmstead v. Zimring, 119 S.Ct. 2176, 2190, 527 U.S. 581, 607 (1999) (State of Georgia liable under Title II for segregating individuals with mental illness into institutions); Lovell, 303 F.3d at 1045 (State of Hawaii liable for equitable relief and compensatory damages where state-run Medicaid program excluded otherwise-eligible individuals with disabilities); Concerned Parents to Save Dreher Park Center v. City of West Palm Beach, 846 F. Supp. 986, 993 (S.D. Fla. 1994) (municipality liable for its failure to fund recreational services for disabled persons on par with those available to non-disabled persons).

Of particular significance to this case, federal courts have specifically recognized the obligation of state and local governments to take steps to ensure

---

[2] The elements for a claim under the Rehabilitation Act mirror the elements for a Title II claim, with the additional element that the entity offering the services must receive federal funds. See Lovell, 303 F.3d at 1052. As Defendants have admitted to receiving federal Medicaid funds to implement its programs, there is no genuine dispute as to this additional element for a Rehabilitation Act claim. (See Shelp Dep. at 87).

that its programs are accessible to deaf persons. In a case strikingly similar to this case, the U.S. District Court for the Southern District of Florida ordered state mental health officials to provide ASL-fluent counselors to deaf Floridians in need of publically-funded mental health counselors. Tugg v. Towey, 864 F.Supp. 1201, 1208 (S.D. Fla. 1994). And in Civic Association of the Deaf of New York City v. Giuliani, 915 F.Supp. 622, 639 (S.D.N.Y. 1996), the U.S. District Court for the Southern District of New York enjoined a plan by New York City to replace aging fire alarm boxes with an "E-911" system, because the new system was more difficult for deaf persons to access.

Federal courts have routinely granted orders of partial summary judgment as to liability where the record establishes that the disabled plaintiffs lack equal benefits from a public service, and the only question is what steps must be taken to correct the disparity. See, e.g. Olmstead, 119 S.Ct. at 2190, 527 U.S. at 607 (affirming order of summary judgment as to liability for disabled plaintiffs confined to institutions); Lovell, 303 F.3d at 1045 (affirming order of summary judgment as to liability for disabled plaintiffs excluded from state-administered Medicaid plan); Soto v. City of Newark, 72 F.Supp.2d 489, 497 (D.N.J. 1999) (granting summary judgment as to liability to deaf plaintiffs denied qualified interpreters); Culvahouse v. City of LaPorte, 679 F.Supp.2d 931, 946 (N.D.Ind.

2009) (granting summary judgment on issue of liability to physically disabled plaintiffs who were unable to use sidewalks due to city's failure to repair); Matthews v. Jefferson, 29 F.Supp.2d 525, 531 (W.D.Ark.1998) (granting summary judgment as to liability to paraplegic plaintiff who could not access courthouse steps); Anderson v. Pennsylvania Dept. of Public Welfare, 1 F.Supp.2d 456, 468 (E.D.Pa. 1998) (granting partial summary judgment to vision and mobility impaired residents of southeastern Pennsylvania on claim that facilities of State's mandatory managed care program did not comply with ADA regulations).

Keeping in mind this landscape of strong legal protections for disabled individuals' access to public services, Plaintiffs will demonstrate that the record in this case establishes, as a matter of law, that the State is not in compliance with Title II or the Rehabilitation Act with respect to deaf individuals' access to the benefits of DBHDD's services.

## 1. Plaintiffs are qualified individuals with a disability.

The ADA defines a "disability," in pertinent part, as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102 (1)(A). "Major life activities" include "hearing." § 12102 (2)(A). A "qualified individual with a disability," for purposes of Title II, includes "one who, with or without reasonable modifications to rules, policies, or

practices, the removal of [. . .] communication [. . .] barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." § 12131(2).[3]

There is no dispute that both Belton and Erickson are substantially limited in the area of hearing, and are therefore "disabled" within the meaning of the ADA. (Belton Aff. at ¶ 3; Boggess Aff. at ¶ 4). There is also no dispute that both Plaintiffs meet the eligibility requirements for DBHDD's mental health and developmental disability services, as they both suffer from mental illnesses and developmental disabilities. (Belton Aff. at ¶¶ 3-4; Boggess Aff. at ¶ 4). Plaintiffs have in fact been deemed eligible by DBHDD to receive those services, (See Doc. 27 (Defendants' Response to Motion for Class Certification), Exhibit A, Affidavit of Anne Tria ("Tria Aff.") at ¶¶ 4-6, 11 (stating that Belton has been found eligible to receive behavioral health and developmental disability related services); Id., Exhibit B, Affidavit of Linda Smith ("Smith Aff.") (Erickson approved to receive residential care for developmentally disabled persons and day programs for mentally ill persons). Therefore, the first element is met.

---

[3] The Rehabilitation Act's definitions of "handicap" and "qualified handicapped person" are coextensive with Title II's definition of "disability" and "qualified individual with a disabilitiy." 34 C.F.R. § 104.3 (j), (l).

## 2. Plaintiffs have been denied equal access to the benefits of DBHDD's services.

Title II and the Rehabilitation Act, along with their implementing regulations, contemplate that, in order to afford disabled persons equal opportunity to receive the benefits of public services, public entities may have to offer modified versions of said services. As the Supreme Court has held, "to assure meaningful access, reasonable accommodations in the [public entity's] program or benefit may have to be made." Alexander v. Choate, 469 U.S. 287, 301, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). As one court has explained:

> The [ADA's] language demonstrates a recognition by Congress that discrimination against persons with disabilities differs from discrimination on the basis of, for example, gender, or race. Discrimination in the latter instances has been judicially defined as disparate treatment on the basis of a certain characteristic that identifies an individual as a member of a protected class. However, a person with a disability may be the victim of discrimination precisely because she did not receive disparate treatment when she needed accommodation. In the context of disability, therefore, equal treatment may not beget equality, and facially neutral policies may be, in fact, discriminatory if their effect is to keep persons with disabilities from enjoying the benefits of services that, by law, must be available to them.

Presta v. Peninsula Corridor Joint Powers Bd., 16 F.Supp.2d 1134, 1136 (N.D.Cal. 1998); see also Wisconsin Comm'y Servs., Inc. v. City of Milwaukee, 465 F.3d 737, 746 (7th Cir.2006) (the ADA "embrace[s] the concept that, in certain instances, the policies and practices of covered entities must be modified to

accommodate the needs of the disabled."); 28 C.F.R. § 35.130(b)(7) ("[A] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the services, program, or activity.").

The Southern District of Florida has applied these concepts to find the state of Florida in violation of Title II for failing to provide ASL-fluent counselors to deaf persons in need of such services. In <u>Tugg</u>, a group of deaf individuals received counseling services from private providers that received their funding through a contract with the state. 864 F.Supp. at 1203. The state contract provided that counseling was to be provided by a hearing clinician, with no special training to work with deaf consumers, assisted by an ASL interpreter. <u>Id.</u> at 1204. The evidence before the court established that effective counseling could only be provided by counselors who were fluent in ASL and who had knowledge and experience working with deaf individuals. <u>Id.</u> at 1206-07. Based on that testimony, the court determined that the Florida program was in violation of Title II and the Rehabilitation Act, and ordered the state to provide counseling services delivered by signing clinicians trained to work with deaf individuals. <u>Id.</u> at 1211.

Similarly, the Southern District of Florida held that the City of West Palm Beach discriminated against the disabled by not offering recreational services from which they could benefit, rejecting the City's argument that it was not liable because "none of the City's recreational programs [we]re closed to individuals with disabilities." Concerned Parents to Save Dreher Park Center, 846 F.Supp. at 991. The Concerned Parents court found that, despite the fact that the City's programs were not "closed" to disabled persons, "many of the general programs are unable to offer the *benefits* of recreation to individuals with disabilities because of the nature of the recreational activities and the physical and other limitations of persons with disabilities." Id. (emphasis added). The Court noted that "the ADA contemplates that different or separate benefits or services be provided if they are necessary to provide qualified individuals with disabilities with . . . services that are as effective as those provided to others." Id. Therefore, the failure to fund programs specifically designed to benefit disabled persons—where programs for able-bodied persons were available—was an act of discrimination as contemplated by Title II. Id. at 992.

This case is strikingly similar to Tugg and Concerned Parents. In each of those cases, as in this case, the State has offered a "one size fits all" program for its residents, without taking into account the special needs of residents who are

challenged by deafness. In Tugg, in fact, the Court resolved an issue identical to a major issue in this case in finding that effective mental health services cannot be delivered to deaf individuals without an adequate supply of ASL-fluent counselors. 864 F.Supp. at 1203. These cases, and the instant case, are controlled by the Supreme Court's admonition that public services must often be modified in order to assure "meaningful access" to disabled persons. Alexander, 469 U.S. at 301.

It is undisputed that Plaintiffs have had been placed on an uneven footing relative to their hearing counterparts in their attempts to access the services of DBHDD. Gale Belton testified in detail as to the protracted and largely unsuccessful struggle she experienced in her attempt to secure meaningful services for her daughter. Gale testified as to being turned away by at least ten (10) providers of group home services, despite having been approved for state funding, due to the lack of resources dedicated to deaf services. (Affidavit of Gale Belton ("Belton Aff."), Attachment 5 at ¶¶ 7-9). Providers were unwilling to accept a deaf consumer, which would require the provider to periodically request an "exceptional rate," on an *ad hoc* basis, making it uncertain whether the funds for deaf-appropriate staff would be available at any given time. (Id.). Exasperated, Gale purchased a home, which she modified with equipment to allow deaf persons to live there, with her own funds, hoping to attract a provider. (Id. at ¶ 9).

When Gale finally located a provider willing to care for Belton in the home, funds often ran out while periodic applications for exceptional rates remained pending. (Id. at ¶¶ 10-12). The provider could not survive economically, often having to pay the extra costs of ASL-fluent staff from its operating funds; at one point, the gas, internet, and cable to the home were cut off due to non-payment as the provider lacked the private funds to keep the services paid. (Id. ¶¶ at 14-18). The provider's contract was eventually revoked. (Id. at ¶ 12). The Beltons have been unable to locate a deaf-appropriate provider of "group home" care, in which Belton could live among other deaf persons with developmental disabilities; instead, Belton has had to settle for a provider of individual support in Belton's home. (Id. at ¶¶ 13-14). That provider continues to struggle against the uncertain "exceptional rate" system, and continues to go through periods in which there is no dedicated funding available for Belton's care. (Id. at ¶ 22).

The State attempted to dispute Belton's contentions regarding her inaccess to DBHDD's services with the affidavit of Anne Tria ("Tria"), a "Waiver Coordinator" for DBHDD, submitted in opposition to Plaintiffs' Motion for Class Certification. (See generally Tria Aff.). Tria contended that Belton had been offered deaf-appropriate services in several residential group homes, but she had turned them down for no good reason. (Id. at ¶¶ 4-11).

However, Tria effectively retracted her affidavit in her deposition. She admitted that she had no first-hand knowledge regarding any of the material facts contained in her affidavit. She had no first-hand knowledge of whether Belton had been offered services from any particular group home provider; she had no knowledge of what sort of public health services were either offered or provided to Belton; and she had no first hand knowledge whether the uncertainties of the "exceptional rate" application process adversely affected the quality of Belton's mental health care and group home placement. (Tria Dep., at 23-24, 27-28). Tria also admitted that she had no first-hand knowledge of the quality of developmental disability-related services offered to deaf persons generally in Georgia; nor did she have knowledge as to the general availability of group homes for deaf persons in Georgia. (Id. at 53, 58-59). In short, Tria's testimony was wholly insufficient to create a genuine factual dispute regarding the substandard nature to services available to Belton as a result of her deafness.

Like Belton's family, Plaintiff Erickson's family has had substantial difficulty in locating a deaf-appropriate group home to care for their son despite the approval by DBHDD of general funding for developmental disability-related care. (Affidavit of Melissa Boggess ("Boggess Aff."), Attachment 6, at ¶¶ 6-7, 10). Just as it did with Gale, DBHDD provided Erickson's mother with a list of group

home providers in their geographic area. Yet, none of the homes were equipped with the technology to accommodate a deaf person, nor were they staffed with ASL-proficient staff. (<u>Id.</u> at ¶¶ 6, 8-9). The one possible "exception" was a provider of non-group home residential care where the owner had used sign language with a great aunt when she was a child. (<u>Id.</u> at ¶ 8). This same operator told Erickson's family that she could instruct a staff person to "learn sign language." (<u>Id.</u>). This approach was unrealistic since ASL is a unique and complicated language that requires years of instruction and immersion to learn. (<u>Id.</u> at ¶ 9).

The State attempted to dispute Boggess' testimony with the affidavit of Linda Smith ("Smith"), a "Planning List Coordinator" for DBHDD who was involved in Erickson's attempt to locate a suitable provider. In her affidavit, Smith claimed that Erickson was "presented [with] numerous providers," which his family "rejected . . . for various reasons other than the sufficiency of deaf services," including the location of the provider, the lack of internet access, or "because Erickson might be bored." (<u>See</u> Smith Aff. at ¶¶ 7-9). Smith stated that "several providers had staff and consumers that signed," and that one provider offered to "have current staff improve their signing skills or hire ASL fluent staff." (<u>Id.</u> at ¶ 11).

Like Tria, Smith recanted much of her affidavit in her deposition. She admitted that the two residential care providers she characterized as deaf-appropriate were actually a residential home in Columbus, Georgia, where the only hope of communication was the woman who owned the house and claimed she had "limited previous experience" using sign language as a child with a deaf aunt. The only other option provided to Erickson was a group home in Atlanta, operated by a company called Rescare that employed a single staff person with some limited sign language ability. (Deposition of Linda Smith ("Smith Dep.") at 30-34, 85).

Smith admitted that she had no personal knowledge regarding the level of ASL signing skills in either of the homes she touted as adequate and equal to the homes where hearing persons were placed. (Id. at 30-33). With regard to the Rescare home, Smith admitted that the home had tried, but failed, to recruit additional staff with signing skills. (Id. at 34). In the end Smith did not offer any testimony to dispute Boggess' testimony that no provider available to Erickson was properly equipped and staffed to care for a deaf person.

Smith also admitted that there were a number of providers in Erickson's geographic area that "would have been appropriate had [Erickson] not been deaf." (Id. at 45). Smith admitted that, although Erickson was provided the same level of funding as other developmentally-disabled persons, "the problem is the issue of

being deaf." (Id.). She admitted that there were a "very limited number" of clinical workers in her area that were proficient in ASL, and that deaf persons in her area had "[l]ess equal access to staff who were specifically trained to communicate with them." (Id. at 46-47). In sum, Smith's testimony actually bolsters Plaintiffs' contentions that they do not have access to mental health services at the same level, both in quantity and quality, as are available to the hearing population. Her testimony falls far short of creating any genuine factual dispute as to Erickson's ultimate contention that he has been denied equal access to the therapeutic benefit of these services. Therefore, Boggess' testimony regarding her son's inability to access the public health and residential benefits of DBHDD stands unrebutted.

For these reasons, the second element of a Title II claim is met.

### 3. Plaintiffs' Lack of Equal Access to DBHDD's Services is Due to Their Deafness, a fact that is Manifested in Four Distinct Areas.

There can be no dispute over the fact that the Plaintiffs' inability to access the benefits of DBHDD's services is due to an institutional failure by DBHDD to modify its programs in a way that would allow them to benefit the deaf. The State took the misguided approach in its opposition to class certification that deaf persons have been offered the "same" providers and group homes as those offered to hearing persons. However, as the jurisprudence on disability discrimination makes clear, "same" is not necessarily "equal" for disabled persons, who require

special accommodations in order to achieve the same benefit from public services. See Alexander, 469 U.S. at 301; Presta, 16 F.Supp.2d at 1136; Wisconsin Comm'y Servs., Inc., 465 F.3d at 746; 28 C.F.R. § 35.130(b)(7).

The State's witnesses, all of whom are DBHDD officials, each confirmed that longstanding institutional failures at DBHDD have deprived deaf persons generally of equal access to its services. Most prominently, the State's own expert Critchfield testified that, though he was recently hired by DBHDD to develop a program to serve deaf persons, that program "obviously isn't operating yet." (Deposition of Dr. Barry Critchfield ("Critchfield Dep.") at 11). The absence of such a program creates barriers to equal access to the deaf in at least four distinct ways.

    a. The Lack of ASL-fluent mental healthcare practitioners denies deaf persons equal benefit to DBHDD's services.

Critchfield acknowledged that Georgia has a "severe shortage" of ASL-fluent mental health practitioners, (Id. at 47), which is a direct result of the State's failure to take tangible steps to develop a workforce of ASL-fluent mental health professionals to staff the six geographic regions in which DBHDD provides services. (Id. at 92). The result, Critchfield confirmed, is that "a deaf patient or deaf consumer in Georgia will have a more difficult time finding competent mental health [care] than a hearing person would." (Id.).

Critchfield blamed the shortfall in ASL-fluent mental health professionals both on a lack of State resources dedicated to deaf services, and the absence of any State program devoted to creating an adequate workforce of ASL-fluent clinicians. (Id. at 49-50). In Critchfield's opinion, the lack of a comprehensive program dedicated to deaf services actually causes Georgia to lose its existing qualified practitioners, who leave the state in search of employment opportunities in states with deaf services programs:

> Q [Counsel for Plaintiffs][. . .] Does Georgia have few [ASL-fluent practitioners] relative to states that have dedicated resources to developing deaf services programs within their mental health agencies?

> A [Critchfield]    Yes, yes. [. . . ] [I]f I were a professional, if I [. . .] just graduated from college and I was fluent in sign language and I wanted to work with deaf people and I graduated from the University of Georgia, I would look around the state of Georgia and realize there's no jobs, and so I would probably move to Minnesota or Oregon where jobs are available.

> Q     [. . .] Because those states have deaf services programs?

> A     Yeah.

(Id. at 98-99).

Critchfield also opined that, while many mental healthcare providers in Georgia would like to serve deaf consumers, the State has failed to provide the financial resources necessary to develop and sustain the kinds of programs needed

to adequately serve deaf persons facing mental illness. (<u>Id.</u> at 123-24).

The lack of deaf-appropriate mental healthcare providers was also confirmed by Charley Bliss, Program and Policy Specialist for Adult Community Mental Health. (<u>See</u> Deposition of Charley Bliss ("Bliss Dep."), at 94-95). DBHDD's Director, Dr. Frank Shelp, identified Bliss as the individual with the most knowledge of the agency's efforts to serve the deaf. (Shelp Dep. at 37).

Bliss developed his base of knowledge regarding the staggering mental health care issues facing deaf persons through his leadership role with the Deaf Services Coalition, a group made up of mental health professionals, DBHDD officials, deaf mental health consumers, and other stakeholders, who meet regularly to develop a strategy for improving access to mental health services by deaf persons. (<u>See</u> Bliss Dep. at 95-96). Through his work with the Deaf Services Coalition, Bliss learned about the serious shortfall of ASL-fluent mental health care practitioners, and the fact that the needs of deaf consumers are "unmet." (<u>Id.</u>). Bliss testified that the lack of ASL-fluent practitioners remains a barrier to adequate care. (<u>Id.</u> at 95-96). Bliss blamed the lack of ASL-fluent professionals on the fact that the agency has relied primarily on interpreters as an intermediary between the deaf patient and the hearing practitioner when deaf consumers do seek services from DBHDD. (<u>Id.</u> at 138-39). Bliss testified that DBHDD is well aware

of the fact that the use of interpreters is not an adequate alternative to ASL-fluent medical practitioners, but the reliance on interpreters is driven by the State's lack of any program to recruit, train, and retain ASL-fluent medical practitioners. (Id.).

Audrey Sumner was the former Director of Community Mental Health Services. She testified that she was unaware of any DBHDD-contracted providers dedicated to accommodate deaf persons. (Deposition of Audrey Sumner ("Sumner Dep.") at 34-35). She recalled a meeting with one provider, who actually proposed using clinical workers from Nashville, Tennessee, who were experienced in working with Deaf consumers, in an attempt to overcome the absence of such workers in Georgia; however, that provider went bankrupt and the contract fell through. (Id. at 32-33).

Critchfield testified that the lack of ASL-fluent clinicians denies deaf persons meaningful benefit from mental health services, and counseling in particular, to wit:

> [A]ll mental health care is based on communication [. . .] between the patient and provider. And when the provider is forced to exercise their professional judgment based solely on their own experience and what their eyeballs tell them, as opposed to being able to hear from the patient what is going on, that [. . .] can create some pretty serious gaps in service quality.

(Critchfield Dep. at 44-45).

For that reason, Critchfield agreed with the Plaintiffs' expert that, "using

interpreters [as an intermediary between a deaf patient and a hearing professional] is second best at best." (Id. at 46). Critchfield further testified:

> [N]o matter what the interpreter's skills and no matter how well they're trained in mental health interpreting . . . , they're still the sole vehicle for communication between the provider and the patient. And interpreters are human beings, they're not computers, they have their own biases, their own personal beliefs one way or another, and unconsciously they filter the information.

(Id. at 46).

Critchfield agreed that "communication between a hearing provider and a hearing patient" is "absolutely" "not equal to communication between a deaf patient and a hearing provider working through an interpreter." (Id. at 46).

Critchfield's testimony mirrors that of Plaintiffs' expert, Steven Hamerdinger, Director of the Alabama Department of Mental Health's Office of Deaf Services. (Hamerdinger Aff. at ¶ 4). Hamerdinger, who is Deaf himself, has a long and successful record of working with public institutions to provide mental health services to the Deaf. (See id. at ¶¶ 4-10 and attached *curriculum vitae*). Hamerdinger testified that attempts at psychological counseling between a deaf person and an untrained "lay" practitioner can often be counterproductive. Hamerdinger quotes the scholarly work of Dr. Robert Pollard, an internationally renowned researcher in psychology and Deafness, to explain why communication is so critical to mental health care, to wit: "Psychiatry is unique among the medical

fields in that most of the symptoms are conveyed by or through communication, and communication also is the primary method and nature of treatment." (Id. at ¶ 18).

Moreover, Hamerdinger states, written communication is not a consistent substitute. Deaf persons often lack English fluency, making attempts to communicate through the written word problematic. (Id. at 13). Worse yet, untrained hearing counselors often consider a Deaf patient's understandable frustration over this inability to communicate to be a tangible symptom of a severe emotional disorder, which increases the chances of a misdiagnosis. (Id. at ¶ 16).

In sum, the experts both agree that the lack of ASL-fluent practitioners, which is a direct consequence of the State's refusal to dedicate adequate funding to deaf services, creates a major barrier to deaf consumers' ability to obtain equal access to the benefit of DBHDD's services.

      b. <u>The State's failure to reimburse medical providers for interpreting services denies deaf persons equal access to DBHDD's services.</u>

The second major systemic barrier to deaf Georgians' access to DBHDD's services is the state's failure to compensate mental healthcare providers for the extra costs associated with sign language interpreters. While an interpreter is no substitute for an ASL-fluent mental health professional, (Critchfield Dep. at 44-47), there are often occasions where an interpreter is necessary as the "second

best" option when an ASL-fluent practitioner is not available. (See id. at 45, 99).

The State has conceded that it has not provided the resources necessary for deaf consumers to access interpreting services. (Id. at 100-101; see also Bliss Dep at 31, 39-41). Presently, interpreting services are provided through private providers who have a contract with DBHDD or Medicaid. These contracts limit the amount the provider can charge to serve deaf consumers who rely on public assistance. (Critchfield Dep. at 100-101). The cost of interpreting services for a deaf patient usually exceeds the rate the provider is being paid to serve the consumer, since the pricing model assumes a hearing patient. (Id.). The State does not reimburse providers for the extra costs of interpreting services. (Id. at 101-102; Bliss Dep. at 39-40). Both Critchfield and Bliss admitted that this shortfall in funding creates an enormous disincentive for providers to accept a deaf patient who relies upon public services. (Critchfield Dep. at 100-103; Bliss Dep. at 39-41). On that point, Critchfield testified as follows:

> Q: And in your experience have you found the fact that providers are expected to foot the bill for those costs to be a barrier to deaf persons receiving appropriate services?

> A: Absolutely, no question about it.

(Critchfield Dep. at 101-102).

c. The State's failure to provide deaf-appropriate group home settings denies deaf persons the equal benefit of DBHDD's services.

The third barrier to equal access, also highlighted by the State's own witnesses, involves the lack of residential care for developmentally disabled and deaf persons. Critchfield testified that congregate living—or "group home"—arrangements of up to four deaf persons with developmental disabilities is an ideal therapeutic setting to allow such a person to live a safe and dignified life. (Critchfield Dep. at 133-34). Critchfield considers the arrangements to be particularly appropriate for groups of deaf persons, living alongside ASL-fluent staff. (Id. at 47-49, 133-34):

> [S]ome adults with developmental disabilities are very limited in their communication abilities expressively, but they may understand a lot more than what they're able to express. And having people that are fluent in sign language around them is a very positive experience.

(Critchfield at 47-48). Critchfield also made it clear that, for a Deaf person to succeed in a group living arrangement, it was "vital" to have ASL-fluent staff in place, as "there has to be fluent two-way communication" between residents and staff. (Id. at 48-49).

Critchfield confirmed that there is a "severe lack of supportive living arrangements that are designed to accommodate the deaf," and that the shortfall is due to the State's failure to provide the proper resources and institutional

infrastructure.  (Id. at 49).

Beverly Rollins ("Rollins"), the Executive Director of the Department of Developmental Disabilities, confirmed that she was unaware of any developmental disability-related service providers geared toward the needs of the Deaf. (Deposition of Beverly Rollins ("Rollins Dep.") at 15).  Rollins further acknowledged the very point on which liability turns, that DBHDD has not allocated adequate funds, nor has it set aside any additional funds to increase developmental disability-related services for deaf persons, since the initiation of this lawsuit. (Id. at 25-40).   In short, it is going to take a Court order to put a remedy in place.

> d.  The State's refusal to fund deaf services denies deaf persons equal access to DBHDD's services.

The budget allocation to DBHDD in Fiscal Year 2010 was over $1.13 billion. (Attachment 4). Yet, for that same period of time, DBHDD has only allocated about $51,000 to deaf Services. (See Attachment 3 (Defendants' Responses to Plaintiffs' First Interrogatories) at ¶ 11). This expenditure represents only about .004% of DBHDD's $1.2 billion budget, which is grossly out of proportion with the estimated .2% of the State's population that is Deaf (See Hamerdinger Aff. at ¶ 20).   Federal courts have recognized that funding for disability-related services that is out of proportion with the population of disabled

consumers is strong evidence of discrimination under Title II. <u>See</u> <u>Concerned</u> <u>Parents</u>, 846 F.Supp. at 989 (budget cuts that disproportionately affected recreational services for disabled persons evidence of discrimination).

Certainly, this gross disproportion in funding for deaf services relative to the overall budget of DBHDD corroborates the unrebutted testimony that there exists a complete shortfall of funding for deaf services at all levels.

Based on these four areas, it is clear that the third element of a Title II claim is met.

## IV. CONCLUSION

Plaintiffs have shown that the record firmly establishes that the State has denied deaf Georgians equal access to the benefits of the public mental health services provided through DBHDD. The evidence relevant to liability is undisputed. The most compelling proof of liability is based on the fact both expert witnesses agree that there is a marked inequality between public mental health services available to hearing Georgians and deaf Georgians.

For all of these reasons, Plaintiffs respectfully request that this Court GRANT their *Motion for Summary Judgment on the Issue of Liability* on Plaintiffs' class-wide claims under the ADA and Rehabilitation Acts, and schedule

an evidentiary hearing to determine a scope of the remedy required to bring the State into compliance with governing law.

Respectfully submitted.

A. Lee Parks
Georgia Bar No. 563750
lparks@pcwlawfirm.com
David F. Walbert
Georgia Bar No. 730450
dwalbert@pcwlawfirm.com
James Radford, Jr.
Georgia Bar No. 108007
jradford@pcwlawfirm.com
Joshua Capilouto
Georgia Bar No. 778707
jcapilouto@pcwlawfirm.com

PARKS, CHESIN & WALBERT, P.C.
75 Fourteenth Street – 26TH Floor
Atlanta, Georgia 30309
Telephone: (404) 873-8000
Facsimile: (404) 873-8050

# <u>CERTIFICATE OF SERVICE</u>

I certify that this *Plaintiffs' Brief in Support of Their Motion for Summary Judgment on the Issue of Liability* is written in Time New Roman, 14 pt. font, in compliance with the Local Rules of this Court. I further certify that on June 20, 2011, I served all parties in this matter with *Plaintiffs' Brief in Support of Their Motion for Summary Judgment on the Issue of Liability* by filing it with the Court's electronic filing and service system (CM/ECF), which shall provide electronic service to the following:

Penny Hannah        Jason Naunas

A. Lee Parks
Georgia Bar No. 563750
lparks@pcwlawfirm.com