UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| RENITA BELTON and MATTHEW ERICKSON on behalf of themselves and all those similarly situated, | : : : | |
| | : | Civil Action File No. |
| Plaintiffs, | : | |
| | : | 1:10-CV-0583-RWS |
| vs. | : | |
| | : | **CLASS ACTION** |
| STATE OF GEORGIA, et. al | : | |
| | : | |
| Defendants. | : | |

---

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS TO WHICH THERE IS NO GENUINE DISPUTE

COME NOW Plaintiffs Renita Belton ("Belton") and Matthew Erickson ("Erickson") (collectively "Plaintiffs"), on behalf of themselves and as class representatives of the certified class, and submit this *Statement of Material Facts to Which There is No Genuine Dispute* in support of their *Motion for Summary Judgment on the Issue of Liability*.

1.

Belton is deaf and depends on American Sign Language ("ASL") as her primary method of communication. (Affidavit of Gale Belton ("Belton Aff."), Attachment 5, at ¶ 3).

2.

Belton has been diagnosed with several mental disorders including Major Depression, Obsessive Compulsive Disorder, Mild Mental Retardation, and Mitochondrial Disorder. (Id.)

3.

Belton's most serious and urgent need of behavioral health services is related to her depression. She has been hospitalized several times for suicidal behaviors. She requires 24-hour "awake" supervision due to the risk of harm she poses to herself and to others. (Id. at ¶ 4).

4.

In May 2006, Belton was approved for a Medicaid "waiver" which provides state and federal funds to pay for the long-term care for a developmentally-disabled individual. (Id. at ¶ 7)

5.

Gale Belton ("Gale"), the mother of Belton, proceeded to contact at least ten (10) different Medicaid-approved group home providers seeking a placement for her daughter. (Id.).

6.

No provider contacted by Gale would accept Belton.  Each provider stated to Gale that they were not equipped to care for a deaf person in a group home setting. (<u>Id.</u>).

7.

In order to accommodate a deaf person in a group home setting, the provider must apply to the State for an "exceptional rate," which may or may not be approved and which must be re-applied for periodically.  This "exceptional rate" provides for additional funds to cover the cost of specialized staff. (<u>Id.</u>).

8.

No provider would accept a deaf client like Belton into a group home setting since the supplemental services required to accommodate a deaf person depends upon an uncertain process of approval of the "exceptional" rate. (<u>Id.</u>).

9.

Some providers contacted by Gale, stated that a request of an "exceptional" rate was considered "taboo" by the State officials who managed the group home contracts.  These providers stated the State had threatened to interfere with and even terminate State contracts if they made applications for "exceptional rates." (<u>Id.</u>)

10.

Gale was given only one option which was to place her daughter into a group home in which she could not communicate with the staff and other residents. Gale refused to place her daughter in that kind of home because she knew that such a placement was effectively a "warehousing" of her daughter that would likely cause her mental illness to worsen. (Id. at ¶ 8).

11.

Since the State was unable to provide a group home placement similar to that provided to hearing person, Gale purchased a home with her own money and equipped it with necessary technology to assist the deaf in daily living tasks. (Id. at ¶ 9).

12.

In April 2007, Gale finally located a small provider (BJ&W) to operate the home, accept her daughter as a resident, and commit to submitting a request for an exceptional rate so the provider could pay for an interpreter. (Id. at ¶ 10).

13.

The "BJ&W" provider received approval for the exceptional rate in August 2007, and used the money to staff the home with ASL-proficient staff. (Id. at ¶ 11).

14.

However, the uncertainties surrounding the application process for renewal of an exceptional rate, which was required every few months, proved to be an administrative nightmare for BJ&W and generated significant uncertainty and stress for the Belton s. (Id.).

15.

The uncertainties of the exceptional rate process manifested themselves in February 2009, when BJ&W's application to renew the exceptional rate needed to provide care for Belton was ignored by the State for several months. (Id.).

16.

By May 2009, the funds from the previous period's exceptional rate were exhausted. Yet, the renewal application to continue the exceptional rate had not yet been approved. (Id.).

17.

From June 2009 to September 2009, BJ&W was forced to spend its own private funds to care for Belton's group home. (Id.).

18.

In August 2009, the gas, internet, and cable to the home were cut off due to non-payment as BJ&W lacked the private funds to keep the services paid by the exceptional rate. (Id.).

19.

This dysfunctional renewal process repeated itself each time BJ&W applied for renewal of the exceptional rate.  Each time, they were required to reapply, wait for a response, and then hope for approval. (Id. at ¶ 12).  In May 2010, the State revoked BJ&W's contract, shortly after the filing of this lawsuit. Gale had to restart the process of locating a provider. (Id.).

20.

Following the loss of BJ&W, Gale located and hired another provider, Douglas Services ("Douglas").  However it was only willing to provide "individual" care to Belton in her home. (Id. at ¶ 13).

21.

Douglas has now experienced the uncertainties of non-payment under the "exceptional rate" system.

22.

Douglas has now been forced to pay for Belton's staff "out of pocket," while they wait to receive the "exceptional rate" funding from the State. (Id. at ¶ 14).

23.

The State previously attempted to dispute Belton's version of the foregoing failures by the State to provide her equal access to the health care benefits offered by the Department of Behavioral Health and Developmental Disabilities ("DBHDD") with the affidavit of Anne Tria ("Tria"), submitted in support of Defendants' opposition to Plaintiffs' Motion for Class Certification. (See Doc. 27 (Defendants' Response to Motion for Class Certification), Exhibit A, Affidavit of Anne Tria ("Tria Aff.")).

24.

Tria's affidavit stated, in pertinent part, that Belton was offered deaf-appropriate services in a number of residential group homes, but that she had turned down these proposed placements for no good reason. (Tria Aff. at ¶¶ 4-11).

25.

The Tria affidavit has proved to be false. In her deposition, Tria admitted she had no first-hand knowledge regarding any of the material facts contained in her affidavit. Namely, she had no first-hand knowledge of whether Belton had

been offered deaf appropriate services from any particular group home provider; she had no knowledge of what sort of services were offered to Belton generally, and she had no first hand knowledge whether the uncertainties of the exceptional rate application process adversely affected the quality of Belton's health care. (Tria Dep. at 23-24, 27-28).

26.

Tria also admitted in her deposition that she had no first-hand knowledge of the quality of developmental disability-related services offered by the State to Deaf persons generally, nor did she have any knowledge as to the general availability of group homes for Deaf persons in Georgia. (Id. at 53, 58-59).

27.

Plaintiff Erickson ("Erickson") is deaf and relies on ASL to communicate. (Affidavit of Melissa Boggess ("Boggess Aff."), Attachment 6, at ¶ 4).

28.

Erickson has been diagnosed with Bipolar Disorder, Obsessive Compulsive Disorder, Asperger syndrome, Oppositional Defiance Disorder, and Pervasive Development Disorder Spectrum. (Id.).

29.

Erickson's family, like Belton's has had substantial difficulty in identifying another appropriate group home to care for their son. (Id., at ¶¶ 6-7, 10).

30.

Just as it did with Gale, DBHDD provided Erickson's mother with a list of group home providers in their geographic area. None of these homes were equipped with the technology to accommodate a deaf person, nor were they staffed with ASL-proficient staff. (Id. at ¶¶ 6, 8-9).

31.

The one possible "exception" was a provider of non-group home residential care where the owner had used sign language with a great aunt when she was a child. (Id. at ¶ 8).

32.

This same operator told Erickson's family that she could instruct a staff person to "learn sign language." This approach was unrealistic since ASL is a unique and complicated language that requires years of instruction and immersion to learn. (Id. at ¶ 9).

33.

The State submitted the affidavit of Linda Smith ("Smith") a "Planning List Administrator" to dispute Boggess' testimony regarding the services the State made available to Erickson. In her affidavit, Smith stated that Erickson was "presented [with] numerous providers," which his family "rejected . . . for various reasons other than the sufficiency of deaf services," including the location of the provider, the lack of internet access, or "because Erickson might be bored." (See Doc. 27 (Defendants' Response to Motion for Class Certification), Exhibit B, Affidavit of Linda Smith ("Smith Aff.") at ¶¶ 7-9).

34.

Smith further stated that "several providers had both staff and Deaf consumers that signed," and that one provider offered to "have current staff improve their signing skills or hire ASL fluent staff." (Id. at ¶ 11).

35.

Smith blamed personal issues with Erickson's mother which she said "delayed" his receipt of deaf appropriate services in a group home context. (Id. at ¶¶ 12, 13-15).

36.

However, Smith admitted in her deposition that the two residential care providers she referred to as deaf-appropriate were (a) the aforementioned residential home in Columbus, Georgia, owned by a woman who had "limited previous experience" using sign language with a deaf aunt; and (b) a group home in Atlanta, operated by a company called Rescare, that employed a single staff person with very limited sign language ability. (Deposition of Linda Smith ("Smith Dep.") at 30-34, 85).

37.

Smith also admitted in her deposition that she had no personal knowledge regarding the ASL skills of the provider owned by the woman who had signed with her deaf aunt as a child, nor of her staff's training to work and communicate with Deaf consumers. (Id. at 30-33).

38.

With regard to the Rescare home, Smith admitted that the home had tried, but failed, to recruit additional staff with signing skills. (Id. at 34).

39.

Smith did not offer any rebuttal testimony to dispute Boggess' affidavit stating that no provider made available to Erickson was properly equipped and staffed to care for a deaf person.

40.

Smith admitted that Erickson's deafness was his primary obstacle to receipt of appropriate mental health care services. She testified that there were a number of providers in his geographic area that "would have been appropriate had [Erickson] not been deaf." (Id. at 45).

41.

Smith also admitted that, although Erickson was provided the same level of funding as other developmentally-disabled persons, "the problem is the issue of being deaf." (Id.).

42.

Smith further admitted that there were a "very limited number" of clinical workers in her area that were fluent in ASL and that deaf persons in her area had "[l]ess equal access to staff who were specifically trained to communicate with them." (Id. at 46-47).

43.

DBHDD is the state agency with primary responsibility to administer state-funded services for mental illness, developmental disabilities, and addictive diseases. (Deposition of Frank Shelp ("Shelp Dep.") at 32-33).

44.

DBHDD currently provides services to over 85,000 adults and 20,000 children and adolescents with mental health, developmental disability, and addictive diseases-related needs. (Defendants' Responses to Plaintiffs' First Interrogatories, Attachment 3, at ¶¶ 1-3).

45.

DBHDD's fiscal year 2010 budget was over $1.13 billion. (Attachment 4, DBHDD Program Budget Financial Summary).

46.

Barry Critchfield ("Critchfield") is the Deaf Services Director for DBHDD and the State's designated expert witness. He testified that he was hired by DBHDD to develop a program to serve Deaf persons, but that program "obviously isn't operating yet." (Deposition of Dr. Barry Critchfield ("Critchfield Dep.") at 11).

47.

Critchfield confirmed that Georgia presently has a "severe shortage" or ASL-fluent mental health practitioners. (Id. at 47).

48.

Critchfield testified that the State has taken no tangible steps to develop a workforce of ASL-fluent mental health professionals to staff the six geographic regions in which DBHDD provides services. (Id. at 92). As a result, "a deaf patient or deaf consumer in Georgia will have a more difficult time finding competent mental health [care] than a hearing person would." (Id.).

49.

Critchfield admitted that the shortfall in ASL-fluent mental health professionals is due both to a lack of state resources dedicated to developing a workforce of ASL-fluent professionals, and the lack of a state program devoted to creating adequate services for Deaf persons. (Id. at 49-50).

50.

In Critchfield's opinion, the lack of a program dedicated to deaf services leads qualified practitioners to leave the state:

Q [Counsel for Plaintiffs][. . .] Does Georgia have few [ASL-fluent practitioners] relative to states that have dedicated resources to developing deaf services programs within their mental health agencies?

A [Critchfield]     Yes, yes. [. . .] [I]f I were a professional, if I [. . .] just graduated from college and I was fluent in sign language and I wanted to work with deaf people and I graduated from the University of Georgia, I would look around the state of Georgia and realize there's no jobs, and so I would probably move to Minnesota or Oregon where jobs are available.

Q     [. . .] Because those states have deaf services programs?

A     Yeah.

(Id. at 98-99).

51.

Critchfield also acknowledged that, while many mental healthcare providers would be willing to serve Deaf consumers, the State has failed to provide the resources required to develop the programs needed to properly serve Deaf persons. (Id. at 123-24).

52.

The lack of deaf-appropriate mental healthcare providers was also confirmed by Charley Bliss, Program and Policy Specialist for Adult Community Mental Health. (See Deposition of Charley Bliss ("Bliss Dep.") at 94-95).

53.

DBHDD's Director, Dr. Frank Shelp, identified Bliss as the individual with the most knowledge of the agency's efforts to serve the deaf. (Deposition of Frank

Shelp ("Shelp Dep.") at 37).

54.

Bliss developed his base of knowledge regarding the substantial mental health care issues facing Deaf persons through his leadership role with the Deaf Services Coalition, a coalition of mental health professionals, DBHDD officials, deaf mental health consumers, and other stakeholders, who meet regularly to develop a strategy for improving access to mental health services by Deaf persons. (See Bliss Dep. at 95-96).

55.

Through his work with the Deaf Services Coalition, Bliss learned about the serious shortfall of ASL-fluent mental health care practitioners, and the fact that the needs of Deaf consumers have been "unmet." (Id.).

56.

Bliss testified that the lack of ASL-fluent practitioners remains a significant barrier to adequate care. (Id. at 95-96).

57.

Bliss testified that, due to a lack of ASL-fluent professionals, DBHDD has relied primarily on interpreters as an intermediary between the deaf patient and the hearing practitioner when Deaf consumers do seek mental health services. (Id. at

138-39).

58.

Bliss testified that DBHDD knows that the use of interpreters is not an adequate alternative to using ASL-fluent practitioners, but the reliance on interpreters remain in place since the DBHDD has no adequate programs in place to train and/or recruit and retain ASL-fluent practitioners. (Id.).

59.

Audrey Sumner, ("Sumner") former Director of Community Mental Health Services, testified that she was unaware of any DBHDD-contracted providers dedicated to accommodate Deaf persons. (Deposition of Audrey Sumner ("Sumner Dep.") at 34-35).

60.

Sumner met with representatives of a provider who she hoped could accept Deaf persons. The provider lacked the staff to accept Deaf persons and proposed using clinical workers from Nashville, Tennessee to meet with Deaf consumers. While that approach was wholly impractical, the provider went bankrupt. (Id. at 32-33).

61.

Critchfield testified that Deaf persons have a need for mental health

practitioners who are fluent in ASL:

> [A]ll mental health care is based on communication [. . .] between the patient and provider. And when the provider is forced to exercise their professional judgment based solely on their own experience and what their eyeballs tell them, as opposed to being able to hear from the patient what is going on, that [. . .] can create some pretty serious gaps in service quality.

(Critchfield Dep. at 44-45). For that reason, Critchfield testified, "using interpreters [as an intermediary between a deaf patient and a hearing professional] is second best at best." (Id. at 46).

### 62.

Critchfield further testified,

> [N]o matter what the interpreter's skills and no matter how well they're trained in mental health interpreting . . . , they're still the sole vehicle for communication between the provider and the patient. And interpreters are human beings, they're not computers, they have their own biases, their own personal beliefs one way or another, and unconsciously they filter the information.

(Id. at 46).

### 63.

Critchfield testified that "communication between a hearing provider and a hearing patient" is "absolutely" "not equal to communication between a deaf patient and a hearing provider working through an interpreter." (Id. at 46).

64.

Critchfield's testimony is consistent with that of Plaintiffs' expert, Steven Hamerdinger ("Hamerdinger"), the current Director of the Alabama Department of Mental Health's Office of Deaf Services. (Affidavit of Steven Hamerdinger ("Hamerdinger Aff."), Attachment 2. at ¶ 4).

65.

Hamerdinger, who is deaf himself, has a long and successful history of working with public institutions to provide mental health services to the Deaf. (See id. at ¶¶ 4-10 and attached *curriculum vitae*).

66.

According to Hamerdinger, counseling between a Deaf person and an untrained "lay" practitioner can often be counterproductive. Hamerdinger cites the works of internationally renowned researcher in psychology and Deafness, Dr. Robert Pollard, who explained that "psychiatry is unique among the medical fields in that most of the symptoms are conveyed by or through communication, and communication also is the primary method and nature of treatment." (Id. at ¶ 18).

67.

A Deaf person's lack of English fluency can often lead to difficulty communicating with a hearing mental health practitioner, resulting in a

misdiagnosis based on the individual's written English. (Id. at ¶ 13).

68.

Untrained counselors can often mistake a Deaf patient's frustration with his inability to communicate for the symptom of severe emotional disorder, further risking misdiagnosis. (Id. at ¶ 16).

69.

While an interpreter is no substitute for an ASL-fluent mental health professional, (Critchfield Dep. at 44-47), there are often occasions where an interpreter is necessary. For example, an interpreter is an essential "second best" option when an ASL-fluent practitioner is not available, and is necessary to communicate with a deaf patient and that patient's family. (See id. at 45, 99). However, the State has not even provided the resources necessary for Deaf consumers to access interpreting services. (Critchfield Dep. at 100-101; see also Bliss Dep at 31, 39-41).

70.

Interpreting services are presently available through private providers who contract with DBHDD or Medicaid. That contract defines how much the provider can charge to serve consumers who rely on public assistance. (Critchfield Dep. at 100-101).

71.

The cost of interpreting services for a deaf patient usually exceeds the rate the provider is being paid to serve the consumer, since the pricing model assumes a hearing patient. (Id.).

72.

The State does not reimburse the providers for the extra costs of interpreting services. (Id. at 101-102; Bliss Dep. at 39-40).

73.

Both Critchfield and Bliss testified that this creates an enormous disincentive for providers to accept a deaf patient who relies upon public services. (Critchfield Dep. at 100-103; Bliss Dep. at 39-41).

74.

On that point, Critchfield testified as follows:

Q: And in your experience have you found the fact that providers are expected to foot the bill for those costs to be a barrier to Deaf persons receiving appropriate services?

A: Absolutely, no question about it.

(Critchfield Dep. at 101-102).

75.

Critchfield testified that congregate living—or "group home"—

arrangements of up to four Deaf persons with developmental disabilities is an ideal

setting to allow such a person to live a safe and dignified life. (Critchfield Dep. at

133-34).

76.

Group home arrangements are particularly appropriate for groups of Deaf

persons, living alongside ASL-fluent staff. (<u>Id.</u> at 47-49, 133-34).

77.

Critchfield testified:

> [S]ome adults with developmental disabilities are very limited in their
> communication abilities expressively, but they may understand a lot
> more than what they're able to express. And having people that are
> fluent in sign language around them is a very positive experience.

(<u>Id.</u> at 47-48).

78.

Critchfield testified that, for a deaf person in a group living arrangement, it

is "vital" to have ASL-fluent staff, as "there has to be fluent two-way

communication" between residents and staff. (<u>Id.</u> at 48-49).

79.

Critchfield confirmed that, currently, there is a "severe lack of supportive

living arrangements that are designed to accommodate the deaf," and that this

shortfall is due to a lack of resources and institutional infrastructure from the state. (<u>Id.</u> at 49).

80.

Beverly Rollins ("Rollins"), the Executive Director of the Department of Developmental Disabilities, confirmed that she was unaware of any developmental disability-related service providers geared toward the needs of the Deaf. (Deposition of Beverly Rollins ("Rollins Dep.") at 15).

81.

Rollins testified that DBHDD had not allocated any additional funds to developmental disability-related services for Deaf persons since the initiation of this lawsuit. (<u>Id.</u> at 25-40).

82.

Of the nearly $1.2 billion allocated to DBHDD in Fiscal Year 2010, (<u>see</u> Attachment 4 (Budget)), DBHDD will only spend about $51,000 on Deaf Services. (<u>See</u> Attachment 3 (Defendants' Responses to Plaintiffs' First Interrogatories) at ¶ 11).

83.

In total, the expenditures budged for deaf services represent about .004% of DBHDD's $1.2 billion budget.  This is grossly out of proportion with the estimated

.2% of the population that is Deaf. (<u>See</u> Hamerdinger Aff. at ¶ 20).

       Respectfully submitted.

                                      A. Lee Parks
Georgia Bar No. 563750
lparks@pcwlawfirm.com
David F. Walbert
Georgia Bar No. 730450
dwalbert@pcwlawfirm.com
James Radford, Jr.
Georgia Bar No. 108007
jradford@pcwlawfirm.com
Joshua Capilouto
Georgia Bar No. 778707
jcapilouto@pcwlawfirm.com

PARKS, CHESIN & WALBERT, P.C.
75 Fourteenth Street – 26TH Floor
Atlanta, Georgia 30309
Telephone: (404) 873-8000
Facsimile: (404) 873-8050

## CERTIFICATE OF SERVICE

I certify that this *Statement of Material Facts as to Which There is No Genuine Dispute* is written in Time New Roman, 14 pt. font, in compliance with the Local Rules of this Court. I further certify that on June 20, 2011, I served all parties in this matter with *Statement of Material Facts as to Which There is No Genuine Dispute* by filing it with the Court's electronic filing and service system (CM/ECF), which shall provide electronic service to the following:

Penny Hannah          Jason Naunas

A. Lee Parks
Georgia Bar No. 563750
lparks@pcwlawfirm.com