**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| RENITA BELTON and | : | |
| MATTHEW ERICKSON on | : | |
| behalf of themselves and all those | : | |
| similarly situated, | : | |
| | : | CIVIL ACTION NO. |
| Plaintiffs, | : | 1:10-CV-0583-RWS |
| | : | |
| v. | : | **CLASS ACTION** |
| | : | |
| STATE OF GEORGIA, et al., | : | |
| | | |
| Defendants. | | |

## ORDER

This case comes before the Court on Plaintiffs' Motion for Summary

Judgment on the Issue of Liability ("Motion for Partial Summary Judgment")

[88].  After reviewing the Record, the Court enters the following Order.

## Background

This case arises out of the alleged failure of the State of Georgia to

provide deaf Georgians with access to public mental health services equal to

that afforded to non-deaf citizens, as is required under Title II of the Americans

with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and Section 504 of

the Rehabilitation Act ("Section 504"), 29 U.S.C. § 701 et seq..  (Pl.'s Partial

AO 72A
(Rev.8/82)

Mot. for Summ. J., Dkt. [88] at 1-2.)  The Court previously certified this case as a class-action on behalf of "[a]ll deaf Georgia citizens who are, or will be in need of public mental health services, but who cannot receive therapeutic benefit from said services due to the Georgia Department of Behavioral Health and Development Disabilities' lack of accommodations for the Deaf."  (Order, Dkt. [82] at 1.)  Plaintiffs seek summary judgment on the issue of Defendants' liability under the ADA and Section 504.

I.      **Facts Relevant to the Named Plaintiffs**

        The two named Plaintiffs are deaf adults who are in need of behavioral health services due to severe mental illness and developmental disabilities. Plaintiff Renita Belton ("Belton") suffers from several mental and developmental disorders, including Major Depression, Obsessive Compulsive Disorder, Mild Mental Retardation, and Mitochondrial Disorder.  (Pls.' Statement of Material Facts ("Pls.' SMF"), Dkt. [88-1] ¶ 2.)  Belton's most serious and urgent need for behavioral health services stems from her depression; she currently requires 24-hour "awake" care due to the risk of harm she poses to herself and to others.  (Id. ¶ 3.)  Similarly, Plaintiff Matthew Erickson ("Erickson") has been diagnosed with Bipolar Disorder, Obsessive

2

Compulsive Disorder, Asperger's Syndrome, Oppositional Defiance Disorder, and Pervasive Development Disorder Spectrum.  (Id. ¶ 28.)  Both Plaintiffs depend on American Sign Language ("ASL") to communicate with others. (Id. ¶¶ 1, 27.)

The Georgia Department of Behavioral Health and Development Disabilities ("DBHDD") is the state agency with primary responsibility to administer state-funded services for mental illness, developmental disabilities, and addictive diseases.  (Id. ¶ 43.)  These services include long-term residential group home programs.  DBHDD currently provides mental health and developmental disability services to over 85,000 adults and 20,000 children and adolescents.  (Id. ¶ 44.)  It is undisputed that Belton and Erickson both qualify to receive services from DBHDD.  Both Plaintiffs claim, however, that the services offered by DBHDD cannot accommodate the needs of deaf persons and, therefore, that they have been denied access to the therapeutic benefits of DBHDD's services.  (Pls.' Partial Mot. for Summ. J., Dkt. [88] at 6 of 37.)

The facts relevant to Belton are as follows.  In May 2006, Belton's mother, Gale Belton, applied to the State on Belton's behalf to receive a Medicaid Home and Community Based Waiver ("waiver").  (Affidavit of

3

Mattie "Gale" Belton ("Gale Belton Aff."), Dkt. [88-5] ¶ 7;  Dep. of Anne P.

Tria ("Tria Dep."), Dkt. [96] at 9:17.)  This waiver provides state and federal

funds to pay for the long-term care of a developmentally-disabled person in a

community setting, as opposed to an institution.  (Tria Dep., Dkt. [96] at 9:18-

25.)  Gale Belton applied for the waiver so that she could place Belton in a

therapeutic group home setting staffed with mental health care professionals, as

was recommended strongly by Belton's psychiatrists and counselors.  (Gale

Belton Aff., Dkt. [88-5] ¶ 7.)

Belton received a waiver in November 2006.  (Id.)  Thereafter, Gale

Belton received from the State a list of Medicaid-eligible group home providers.

(Id. ¶ 7; Pls.' SMF, Dkt. [88-1] ¶ 5; Defendants' Response to Pls.' SMF, Dkt.

[100] ¶ 5.)  Gale Belton proceeded to contact at least ten (10) group home

providers, none of which would accept Belton.  (Pls.' SMF, Dkt. [88-1] ¶ 6.)

Each provider explained that they were not equipped to care for a deaf person in

a group setting.[1]  (Id.)  Another provider offered to accept Belton in its group

_____

[1] Defendants purport to deny Plaintiffs' allegation that Belton could not find a
group home provider equipped to care for a deaf person.  (Defs.' Resp. to Pls.' SMF,
Dkt. [100] ¶ 6.)  Defendants do not point to any evidence, however, to refute these
allegations.  They rely only on deposition testimony of Beverly Rollins, the current
Executive Director of Developmental Disabilities, according to which Rollins

4

home, but the home did not have ASL-proficient staff or any other deaf consumers with whom Belton would be able to communicate.  (Gale Belton Aff., Dkt. [88-5] ¶ 8.)  Given that Belton would be unable to communicate with those around her, Gale Belton rejected this placement.  (Id.)

Some of the facts surrounding Belton's continued struggle to find deaf-appropriate group home care are disputed after this point.  According to Plaintiffs' version of the facts, after the State proved unable to provide Belton with deaf-appropriate group home care, Gale Belton purchased a home with her own funds and equipped it with the technology necessary to accommodate deaf persons in their daily life activities.  (Pls.' SMF, Dkt. [88-1] ¶ 11; Gale Belton Aff., Dkt. [88-5] ¶ 9.)  Her hope was that a pre-equipped home would attract a deaf-appropriate group home service provider.  (Gale Belton Aff., Dkt. [88-5] ¶ 9.)  Defendants contend, on the other hand, that Gale Belton had considered

---

"remember[s] [Belton] . . . getting the services that she needed[,]" and "[does not] recall that her family had an extraordinary struggle to obtain these services[.]" (Id. (citing Dep. of Beverly Rollins ("Rollins Dep."), Dkt. [93] at 16:21-17:3).)  This evidence does not directly refute Plaintiffs' evidence that Gale Belton contacted ten group home providers, none of which could accommodate Belton because of her deafness.  The Court thus finds the evidence insufficient to create a dispute of material fact as to whether the State's group home care providers recommended to Belton could accept a deaf person.

5

opening a group home as early as the fall of 2005, well before she applied for

DBHDD's services, and purchased the home in June 2006, after she had applied

for DBHDD's services but before she had been given a list of State-approved

group home providers.  (Defs.' Resp. to Pls.' SMF, Dkt. [100] ¶ 11 (citing Dep.

of Gale Belton ("Belton Dep."), Dkt. [103] at 114, 116, 133 & 139).)  Thus,

Defendants argue, Gale Belton cannot claim to have been forced to open a

group home with her own funds due to a lack of State-services, as she opened

the home prior to learning what services the State could provide.[2]  (Defs.' Resp.

to Pls.' Mot. for Partial Summ. J., Dkt. [99] at 5 of 25.)

Nonetheless, a small provider, BJ&W, eventually was located to operate

Gale Belton's home and accept Belton as a resident.  (Id. ¶ 12.)  Ultimately,

however, the State revoked BJ&W's contract.  (Pls.' SMF, Dkt. [88-1] ¶ 19.)

While the State was able to locate another provider for Belton, Douglas

Services, this provider could only provide Belton with "individual" care in her

own home, not group home care.  (Id. ¶ 20.)

---

[2] In her deposition testimony, Gale Belton explains that while she began
considering opening a group home prior to applying for DBHDD's services, and
purchased her home before DBHDD had given her a list of potential providers, she
already had investigated the availability of deaf-appropriate group homes and found
none to exist.  (Belton Dep., Dkt. [103] at 113:9-114:14.)

6

Like Belton, Erickson also had difficulty finding deaf-appropriate group home care.  As it did for Belton, DBHDD provided Erickson's mother with a list of group home providers; none of them, however, was equipped with technology to accommodate a deaf person and none was staffed with ASL-proficient staff.  (Id. ¶ 30; Defs.' Resp. to Pls.' SMF, Dkt. [100] ¶ 30.) Defendants purport to dispute the latter assertion that none of the group homes had ASL-proficient staff.  (Defs.' Resp. to Pls.' SMF, Dkt. [100] ¶¶ 30-32.)  To this end, Defendants point to the fact the owner of one group home had, as a child, utilized ASL with a family member and was willing to further train in ASL by "taking some classes."  (Id. ¶¶ 30, 32 (citing Dep. of Linda Smith ("Smith Dep."), Dkt. [94] at 30, 33).)  Smith admitted in her deposition, however, that this person had not used sign language as an adult and that Smith had no personal knowledge regarding this person's ASL proficiency or whether she had ever received formal training.[3]  (Smith Dep., Dkt. [94] at 30:10-22, 32:15-25.)  Erickson's family rejected this placement, finding the offer to "learn

---

[3] Smith also testified in her deposition that another group home care provider, Rescare, had a staff member who "knew how to sign some, wanted and was willing to receive additional training."  (Smith Dep., Dkt. [94] 34:2-6.)  She also testified that Rescare had tried but failed to hire additional ASL-proficient staff.  (Id. at 34:6-15.)

7

sign language" "unrealistic[,] since ASL is a unique and complicated language that requires years of instruction and immersion to learn."  (Pls.' SMF, Dkt. [88-1] ¶ 32.)  Finally, Smith testified in her deposition that the service providers recommended to Erickson would have been appropriate had he not been deaf.  (Smith Dep., Dkt. [94] at 45:1-7.)  Unable to locate a State-provided group home in which he would be able to communicate, Erickson currently lives at home with his family, with whom he can communicate using ASL.  (Aff. of Melissa Boggess ("Boggess Aff."), Dkt. [88-6] ¶¶ 10-11.)

## II.    Facts Relevant to the Plaintiff Class

Plaintiffs contend that the individual experiences of Belton and Erickson "tell the story of all deaf Georgians in need of equal access to DBHDD's public services," which access is thwarted by a number of institutional failures by the State to make its mental health services available to deaf persons.  (Pls.' Partial Mot. for Summ. J., Dkt. [88] at 7, 9 of 37.)  Specifically, Plaintiffs identify four institutional failures on the part of Defendants that prevent deaf Georgians from obtaining meaningful access to the State's services, which failures allegedly render the State liable under the ADA and Section 504: (1) the State's lack of ASL-fluent mental health practitioners; (2) the State's failure to reimburse

medical providers for interpreting services; (3) the State's failure to provide deaf-appropriate group home care settings; and (4) the State's refusal to provide adequate funding for deaf services.  (Id. at 25-35 of 37.)

First, with regard to ASL-fluent mental health care practitioners, the parties do not dispute that the State presently has a "severe shortage."  (Pls.' SMF, Dkt. [100] ¶ 47.)  Dr. Barry Critchfield ("Critchfield"), the current director of deaf services for DBHDD, specifically testified to this problem.[4] (Critchfield Dep., Dkt. [92] at 49:4-8.)  He testified that DBHDD's current provision of services to the deaf was not satisfactory (id. at 11:24-12:3.), in part because of the "severe shortage of ASL-fluent clinical workers," (id. at 47:1-5). As a result of this shortage, Critchfield testified that it is more difficult for a deaf consumer in Georgia to find competent mental health care than it is for a hearing consumer.  (Id. at 47:6-10.)  Finally, Critchfield testified that this shortage of ASL-fluent health care providers is due to a lack of State resources and institutional infrastructure.  (Id. at 49:11-50:6.)  With regard to the lack of

_____

[4] Dr. Critchfield was offered his current position with DBHDD in October of 2010 and began working in that capacity on January 4, 2011.  (Id. at 5:10-23.)  He was specifically hired to develop a program for the deaf and testified that "the deaf program obviously isn't operating yet."  (Id. at 10:19-21, 11:8-13.)

institutional infrastructure, Dr. Critchfield testified that the State of Georgia has few ASL-fluent practitioners compared to states that have dedicated resources to developing deaf-appropriate mental health services.  (Id. at 98:16-20.)

Charley Bliss, the current Program and Policy Specialist for Adult Community Mental Health,[5] similarly testified to his current belief that "[w]ithout recruiting practitioners fluent in ASL and hiring qualified interpreters trained in mental health, many consumers who are deaf will continue to not receive community-based services and their needs will remain unmet."  (Bliss Dep., Dkt. [80] at 94:22-96:11.)  In other words, Bliss stated that the State's current lack of mental health practitioners fluent in sign remains a barrier to deaf persons receiving adequate care.  (Id. at 96:12-21.)  Bliss further testified that due to this lack of ASL-fluent practitioners, when deaf consumers seek mental health services from the State, DBHDD relies primarily on interpreters to serve as an intermediary between the deaf consumer and a hearing practitioner.  (Pls.' SMF, Dkt. [88-1] ¶ 57.)

---

[5] DBHDD's Director, Dr. Frank Shelp, identified Bliss as the person with the most knowledge of the agency's efforts to provide services to the deaf.  (Pls.' SMF, Dkt. [88-1] ¶ 53.)

AO 72A
(Rev.8/82)

Despite DBHDD's reliance on interpreters in delivering mental health care to deaf consumers, both Drs. Bliss and Critchfield testified that interpreters are an inadequate substitute for ASL-fluent practitioners. For example, Dr. Critchfield testified,

> All mental health care is based on communication . . . between the patient and the provider. And when the provider is forced to exercise their [sic] professional judgment based solely on their own experience and what their eyeballs tell them, as opposed to being able to hear from the patient what is going on, that, you know, can create some pretty serious gaps in service quality. . . . So, yes, I would certainly agree that a provider that is fluent in sign language is able to understand from the patient what's going on.

(Critchfield Dep., Dkt. [92] at 44:20-45:7.) He further stated,

> [N]o matter what the interpreter's skills and no matter how well they're trained in mental health interpreting and so forth, they're still the sole vehicle for communication between the provider and the patient. And interpreters are human beings, they're not computers, they have their own biases, their own personal beliefs one way or another, and unconsciously they filter information.

(Id. at 46:5-12.) Accordingly, Critchfield confirmed it to be "absolutely correct" that "[c]ommunication between a hearing provider and a hearing patient is not equal to communication between a deaf patient and a hearing provider through an interpreter[.]" (Id. at 46:21-25.) (See also Bliss Dep., Dkt. [80] at 138:16-139:3 (testifying that to serve the needs of deaf consumers,

11

DBHDD must "develop sign-fluent practitioners" rather than rely on the use of interpreters).)

Plaintiffs have also produced evidence that the State's group home care services cannot accommodate the needs of the deaf because none contains ASL-proficient staff, as the individual experiences of Belton and Erickson illustrate. Indeed, Dr. Critchfield testified that the State currently faces a "severe lack of supportive living arrangements that are designed to accommodate the deaf" specifically because of the severe shortage of ASL-fluent individuals to staff group homes.  (Critchfield Dep., Dkt. [92] at 48:18-49:17.)  Dr. Critchfield testified that group home living arrangements for deaf persons with developmental disabilities is an ideal setting to allow those persons to live "a safe and dignified life."  (Pls.' SMF, Dkt. [100] ¶ 75.)  He also testified, however, that for deaf consumers to receive the therapeutic benefit of group home living, it is "vital" to have ASL-fluent staff, as "there has to be fluent two-way communication" between residents and staff.  (Id. ¶ 78.)

With regard to the State's alleged failure to reimburse mental health care providers for the cost of interpreting services, Plaintiffs put forward the following evidence.  First, Plaintiffs argue that while interpreters are no

substitute for ASL-fluent mental health care practitioners, there are situations

where interpreters are necessary.  (Pls.' Partial Mot. for Summ. J., Dkt. [88] at

31 of 37.)  Indeed, as stated above, given the shortage of ASL-fluent

practitioners, the State primarily relies on interpreters to deliver mental health

care to deaf consumers.  (Pls.' SMF, Dkt. [88-1] ¶ 57.)  Plaintiffs put forward

evidence, however, that the State currently has no funding mechanism to

reimburse health care providers for the cost of interpreting services, which

costs, instead, are absorbed by the provider.  (Bliss Dep., Dkt. [80] at 31:2-9,

39:17-40:9, 40:22-41:3.)  Dr. Bliss testified that this creates a significant

economic disincentive for health care providers to serve deaf consumers.  (Id. at

41:3-8.)  Thus, to better care for the needs of deaf consumers, Dr. Bliss has

recommended that the State develop a funding mechanism for interpreter

services.  (Id.)

Similarly, Dr. Critchfield testified that health care providers currently

shoulder the expense of providing interpreter services for deaf consumers

without assistance from the State.  (Critchfield Dep., Dkt. [92] at 99:22-100:10,

101:23-102:2.)  Dr. Critchfield explained that, ideally, a health care provider

would cover these costs by spreading them out among all consumers through

13

increased health care service rates.  (Id. at 100:6-14, 102:9-13.)  In the case of

consumers who receive public assistance, however, such as the members of the

Plaintiff Class, rates are determined by the government and therefore cannot be

increased to cover these costs.  (Id. at 102:17-103:4.)  Like Dr. Bliss, Dr.

Critchfield testified that "the fact that providers are expected to foot the bill for

[interpreter costs]" is "absolutely" "a barrier for Deaf persons receiving

appropriate services."  (Critchfield Dep., Dkt. [92] at 101:23-102:2.)

        In response to this evidence, Defendants argue that DBHDD does

compensate health care providers for the cost of interpreter services "by

building in an extra 5% payment into the provider agreement."  (Defs.' Resp. to

Pls.' Partial Mot. for Summ. J., Dkt. [99] at 20 of 25.)  In support of this

argument, Defendants rely on the deposition testimony of Audrey Sumner, a

Regional Coordinator for DBHDD.  Sumner testified that DBHDD builds an

extra 5% payment into service providers' contracts, which providers can use as

"discretionary funds."  (Sumner Dep., Dkt. [95] at 21:5-10.)  Because health

care providers can pay for interpreter services out of this 5%, Sumner testified

that providers are not required to pay for these services "out of pocket."  (Id. at

14

21:15-16.)  Sumner also testified, however, that if the 5% payment is not spent, the health care provider can retain it.  (Id. at 22:21-24.)

Finally, Plaintiffs contend that Defendants have violated the ADA by providing a level of funding for deaf services that is disproportionate to the percentage of the population that is deaf.  (Pls.' Partial Mot. for Summ. J., Dkt. [88] at 34 of 37.)  Plaintiffs contend, for example, that for fiscal year 2010, DBHDD allocated only 0.004% of its budget to deaf services, while an estimated 0.2% of the population is deaf.  (Id.)  Thus, Plaintiffs argue, "this gross disproportion in funding for deaf services relative to the overall budget of DBHDD corroborates the unrebutted testimony that there exists a complete shortfall of funding for deaf services at all levels."  (Id. at 35 of 37.)

After setting out the legal standard governing Plaintiffs' motion for summary judgment, the Court considers each of these alleged failures on the part of the State to make its mental health care services equally available to deaf consumers as to the general public.

## Discussion

## I.     Summary Judgment Legal Standard

Federal Rule of Civil Procedure 56 requires that summary judgment be

granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotations omitted)). Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257  (1986).

The applicable substantive law identifies which facts are material. Id. at 248. A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law. Id. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249-50.

16

Finally, in resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party.  Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002).  But, the court is bound only to draw those inferences which are reasonable.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met its burden under Rule 56(a), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

## II.   Plaintiffs' Motion for Summary Judgment

As stated in the Background section, supra, Plaintiffs seek summary judgment on the issue of Defendants' liability under Title II of the ADA and Section 504 of the Rehabilitation Act for effectively denying deaf consumers access to the State's mental health care services.  Both Title II and Section 504

17

prohibit discrimination in the delivery of public services on the basis of

disability.  Specifically, the ADA provides,

> [N]o qualified individual with a disability shall, by reason of such
> disability, be excluded from participation in or be denied the
> benefits of the services, programs or activities of a public entity, or
> be subjected to discrimination by any such entity.

42 U.S.C. § 12132.  Similarly, Section 504 of the Rehabilitation Act provides:

> No otherwise qualified individual with a disability in the United
> States . . . shall, solely by reason of her or his disability, be
> excluded from the participation in, be denied the benefits of, or be
> subjected to discrimination under any program or activity receiving
> federal financial assistance.

29 U.S.C. § 794(a).[6]

The regulations implementing the ADA's prohibition against

discrimination, 28 C.F.R. pt. 35 (1998), prohibit public entities, in the provision

---

[6] The ADA applies only to public entities while the Rehabilitation Act applies
to all federally-funded programs.  Lovell v. Chandler, 303 F.3d 1039, 1052 (9th Cir.
2002).  Defendants have admitted to receiving federal Medicaid funds (Dep. of Dr.
Frank Shelp ("Shelp Dep."), Dkt. [81] at 87:20-88:8) and do not dispute the
applicability of the Rehabilitation Act to this case.  Because the causes of action are
the same, the Court–like the parties–will analyze Plaintiffs' claims under ADA
precedent.  Cash v. Smith, 231 F.3d 1301, 1305 & n.2 (11th Cir. 2000) (providing that
"[d]iscrimination claims under the Rehabilitation Act are governed by the same
standards used in ADA cases," and "[c]ases decided under the Rehabilitation Act are
precedent for cases under the ADA, and vice-versa.").

18

of any aid, benefit, or service, from doing any of the following on the basis of

disability:

> (i)     Deny[ing] a qualified individual with a disability the
>         opportunity to participate in or benefit from the aid, benefit,
>         or service;
>
> (ii)    Afford[ing] a qualified individual with a disability *an
>         opportunity to participate in or benefit from the aid, benefit,
>         or service that is not equal to that afforded others*;
>
> (iii)   Provid[ing] a qualified individual with a disability with an
>         aid, benefit, or service that is *not as effective in affording
>         equal opportunity to obtain the same result, to gain the same
>         benefit, or to reach the same level of achievement as that
>         provided to others*; [or]
>
> (iv)    Otherwise limit a qualified individual with a disability in the
>         enjoyment of any right, privilege, advantage, or opportunity
>         enjoyed by others receiving the aid, benefit or service.

28 C.F.R. § 35.130(b)(1) (emphasis added).  The regulations further require

public entities to make "reasonable modifications" to their procedures to avoid

discriminating on the basis of disability:

> A public entity shall make reasonable modifications in policies,
> practices, or procedures when the modifications are necessary to
> avoid discrimination on the basis of disability, unless the public
> entity can demonstrate that making the modifications would
> fundamentally alter the nature of the service, program, or activity.

Id. § 35.130(b)(7).

19

To prevail on a Title II claim, a plaintiff must prove "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or *denied the benefits of a public entity's services, programs, or activities*, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability."   Bircoll v. Miami-Dade Cnty., 480 F.3d 1072, 1083 (11th Cir. 2007) (emphasis added).  In this case, Defendants do not dispute that Plaintiffs, as a result of their deafness, are "qualified individuals with a disability" within the ambit of the ADA.[7]  The only issue, therefore, is whether Plaintiffs have been denied access to DBHDD's mental health care services, and, if so, whether this denial in access is a result of Plaintiffs' deafness.

_____

[7] The ADA defines "disability" to include "a physical or mental impairment that substantially limits one or more major life activities of such individual[.]" 42 U.S.C. § 12102(1)(A).  "Major life activities" is defined to include "hearing."  Id. § 12102(2)(A).  Thus, Plaintiffs are "disabled" within the meaning of the ADA.  The ADA defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of . . . communication . . . barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  Id. § 12131(2).  As stated in the Background section, supra, the named Plaintiffs meet the eligibility requirements for receipt of DBHDD's benefits and services.  Accordingly, Plaintiffs are qualified individuals with a disability to whom the ADA's protections apply.

20

The majority of Defendants' brief in opposition to Plaintiffs' motion for summary judgment concerns the services that the named Plaintiffs currently receive–in their private homes–from DBHDD.  (See generally Defs.' Resp. to Pls.' Mot. for Summ. J., Dkt. [99] at 1-16 of 25.)  Thus, with regard to the claims of the named Plaintiffs, Defendants argue, "Plaintiffs were offered and have received services with ASL-proficient staffing. . . .  They have the ability to access the same services as a hearing person with developmental disabilities. In fact the Plaintiffs have not shown that a hearing person would have been treated differently." (Id. at 11 of 25.)  With regard to the claims of the Plaintiff Class, Defendants argue that Plaintiffs have failed to show any institutional failure on the part of the State to make its services equally available to deaf consumers as to the general public.  (Id. at 16-25.)  The Court considers these arguments in turn.

A.     Claims of the Named Plaintiffs

The Court finds sufficient evidence in this case to prove as a matter of law that the named Plaintiffs have been denied the benefit of a State-provided mental health care service, group home living, in violation of the ADA.  This is in spite of Defendants' arguments to the contrary.  First,  Defendants argue that

21

the named Plaintiffs cannot recover under the ADA because they have been

given access to "the same" services as hearing consumers.  (Defs.' Resp. to Pls.'

Mot. for Partial Summ. J., Dkt. [99] at 11 of 25.)  This argument, however,

misses the point of the ADA.  Indeed, Plaintiffs' ADA claims in this case stem

precisely from the fact that the mental health services afforded to them and

other deaf consumers are "the same" as those provided to hearing consumers.

As articulated above, the ADA expressly prohibits the State from denying

state benefits to an otherwise eligible person because of a disability.  The Act's

implementing regulations make clear that this denial of benefits need not be

express or direct to run afoul of the ADA.  On the contrary, discrimination in

the provision of State services occurs when disabled persons, because of their

disability, cannot derive a benefit from the State's services, which formally are

made available to all persons generally.  See 28 C.F.R. § 35.130(b)(1)(ii)-(iii)

(finding discrimination in violation of ADA when disabled persons have

unequal opportunity to participate in state services or unequal ability to realize

the benefit of those services).  Thus, discrimination in violation of the ADA can

occur even though disabled consumers are given the exact same services or

benefits as those afforded to non-disabled consumers.

22

In recognition of the fact that equal services can nonetheless discriminate on the basis of disability, the ADA regulations require public entities to make "reasonable modifications" to their services where necessary to provide disabled persons with meaningful access to those services.  See 28 C.F.R. § 35.130(b)(7) ("A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."); Alexander v. Choate, 469 U.S. 287, 301 (1985) ("[A]n otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers. . . . [T]o assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made.").[8]  As one court has explained:

> "The [ADA]'s language demonstrates a recognition by Congress that discrimination against persons with disabilities differs from discrimination on the basis of, for example, gender, or race. Discrimination in the latter instances has been judicially defined as disparate treatment on the basis of a certain characteristic that

---

[8] Modifications are not required, however, where they would result in a "fundamental alteration in the nature of the program."  Alexander, 469 U.S. at 300 (internal quotation marks and citation omitted).

23

> identifies an individual as a member of a protected class.
> However, a person with a disability may be the victim of
> discrimination precisely because she did not receive disparate
> treatment when she needed accommodation.  In the context of
> disability, therefore, equal treatment may not beget equality, and
> facially neutral policies may be, in fact, discriminatory if their
> effect is to keep persons with disabilities from enjoying the
> benefits of services that, by law, must be available to them."

Presta v. Peninsula Corridor Joint Powers Bd., 16 F. Supp. 2d 1134, 1136 (N.D.

Cal. 1998).  In other words, where a disabled person cannot derive any benefit

from a public entity's services, and where reasonable accommodations could be

made to make the services accessible, the public entity's failure to do so

violates the ADA.

In accordance with the foregoing (and in a case quite similar to this one),

the United States District Court for the Southern District of Florida found a

substantial likelihood of success on the plaintiffs' claim that the state violated

the ADA by denying deaf consumers the benefits of mental health services

provided to the general public.  Tugg v. Towley, 864 F. Supp. 1201, 1208 (S.D.

Fla. 1994).  The plaintiffs in Tugg represented a class of "all deaf/ hearing

impaired individuals . . . who presently receive or will be in need of mental

health counseling services."  Id. at 1204.  The plaintiffs claimed that the state's

24

plan to provide mental health counseling services to deaf consumers through hearing counselors aided by sign language interpreters–rather than ASL-proficient counselors–violated the ADA by withholding from deaf consumers equal counseling services as those provided to the general public.  <u>Id.</u> Specifically, the plaintiffs argued that "equivalent mental health services could only be provided by counselors, deaf or hearing, with sign language ability . . . ." <u>Id.</u>

For purposes of Plaintiffs' motion for a preliminary injunction, the <u>Tugg</u> court agreed.  The court emphasized the plaintiffs' evidence that the use of an interpreter "inhibits the effectiveness of mental health counseling," thus depriving deaf consumers of the therapeutic benefits of that counseling.  <u>Id.</u> at 1206.  In particular, the plaintiffs presented evidence that communication between therapist and patient is critical to effective treatment, and that given the abstract nature of ASL, the use of interpreters greatly increases the risk of mis-communication.  <u>Id.</u>  Based on this evidence, and the defendants' failure to rebut it, the court in <u>Tugg</u> found "sufficient evidence to demonstrate that [the] [d]efendants ha[d] denied [the] [p]laintiffs, by reason of their disability, the benefits of mental health services provided by [the state] to the general public."

Id. at 1208.

The court reached a similar conclusion in Concerned Parents to Save
Dreher Park Center v. City of West Palm Beach, 846 F. Supp. 986 (S.D. Fla.
1994), a case concerning state-provided recreational programs.  In Concerned
Parents, the plaintiffs were disabled persons who challenged the City of West
Palm Beach's decision to eliminate certain recreational programs designed for
disabled persons.  Id. at 988.  After conducting a needs assessment, the City had
discovered a significant disabled population in the City in need of leisure
services.  Id.  As a result, the City promulgated an array of recreational and
social programs for disabled individuals and their families (the "Dreher Park
Center programs"), which were offered by the City alongside other recreational
programs offered to the general public.  Id. at 988, 991.  Several years later,
however, in light of budget constraints, the City completely eliminated each of
the programs for persons with disabilities, giving rise to the plaintiffs' ADA
challenge.  Id. at 989.

The plaintiffs argued that the City's elimination of the Dreher Park
Center programs effectively denied persons with disabilities the benefits of the
City's recreational programs.  Id. at 991.  In response, the City argued that it

had not violated the ADA because none of its other recreational programs were

closed to persons with disabilities.  Id.  The court rejected this argument,

reasoning as follows:

> While it is true that there is no evidence of deliberate exclusion of
> disabled persons from the general recreational programs offered by
> the City, it is clear that many of the general programs are unable to
> offer the benefits of recreation to individuals with disabilities
> because of the nature of the recreational activities and the physical
> and other limitations of persons with disabilities.

Id. at 991.

Similar to the plaintiffs in Tugg and Concerned Parents, the Plaintiffs in

this case argue that the State has offered its residents a "one size fits all" mental

health care program without taking into account the needs of deaf consumers, in

particular, their reliance on ASL to communicate.  This, Plaintiffs contend, runs

afoul of the ADA and the State's obligation to make reasonable modifications

to its services to provide disabled persons with meaningful access to them.  The

Court agrees.

With respect to the individual claims of Belton and Erickson, the

evidence shows that neither named Plaintiff was able to take advantage of the

State's group homes services because no group home had ASL-proficient staff

27

with whom the named Plaintiffs could communicate.  Thus, because of their deafness, Belton and Erickson were denied meaningful access to a State-provided service that is offered to the general public.  (This particular service is also one that the State's own representative, Dr. Critchfield, has described as therapeutically "ideal" for deaf consumers such as Belton and Erickson).

The Court notes that Defendants have offered no evidence to rebut Plaintiffs' showing in this regard.  In response to the evidence regarding Belton's inability to find a deaf-appropriate group home, Defendants argue that DBHDD "has provided [Belton] with ASL-proficient staff twenty-four hours per day, seven days per week since 2007 . . . [and] . . . has spent well over $100,000 per year for the last four years on [her] care and currently spends $396.94 per day."  (Defs.' Resp. to Pls.' Partial Mot. for Summ. J., Dkt. [99] at 2 of 25 (citations omitted).)  Defendants further point out that Belton "sees an ASL-proficient counselor as often as she needs."  (Id.)  No matter how extensive or beneficial Belton's State-provided services may be, however, Defendants have presented no evidence to rebut Plaintiffs' showing that

28

because of her deafness, she could not obtain access to any of the State-provided group homes made available to the general public.[9]

Similarly, Defendants have failed to rebut Plaintiffs' evidence regarding Erickson's inability to participate in the State's group home services. As set forth in the Background section, <u>supra</u>, Defendants argue that two of the State's group homes were staffed with ASL-proficient persons and thus could accommodate Erickson's needs. The evidence shows that the owner of one home had used ASL with a family member as a child, had never used it as an adult, and was willing to further her skills by "taking some classes." The evidence shows that in the other home, one staff member had "some" ASL ability and was willing to, but ultimately failed to, recruit additional ASL-proficient staff. With regard to both of these individuals, the State's representative, Linda Smith, testified that she had no personal knowledge

---

[9] Defendants argue that they have provided Belton with a group home "by providing her twenty-four hour care, seven days per week with ASL-proficient staff in her own home." (Defs.' Resp. to Pls.' Partial Mot. for Summ. J., Dkt. [99] at 3.) Defendants contend that Belton has not had access to a group home only because of her failure to locate roommates with whom to share her home. (Id.) This argument is without merit and does not rebut the evidence Plaintiffs have shown that no State-provided group home recommended by the State to Belton could accommodate her in light of her deafness.

29

regarding their proficiency in ASL or whether they ever had obtained formal training.

Little discussion is required to explain the Court's conclusion that this evidence is insufficient to rebut Plaintiffs' showing that Erickson could not find a group home capable of caring for his needs–i.e., one staffed with ASL-proficient individuals with whom he could communicate.  As Defendants' own representative, Dr. Critchfield, has testified, for deaf consumers to receive the therapeutic benefits of group home living, it is "vital" that there be two-way communication between the consumers and the staff.  A staff member's recollection of an unknown amount of childhood ASL is insufficient, as are the State's assurances that a single group home staff member knows "some" ASL, when the State has no knowledge regarding the level of the staffer's proficiency or whether he or she has ever received formal training.

In short, Defendants have presented no evidence to rebut Plaintiffs' showing that despite their efforts, neither Belton nor Erickson could find a State-provided group home that could accommodate a deaf consumer's need to communicate with those around him or her using ASL.  Absent the ability to communicate with others, the evidence shows that neither Belton nor Erickson

30

would be able to realize the therapeutic benefit of group home living.  Thus, the named Plaintiffs have proven that, because of their deafness, they have been denied meaningful access to a mental health care service provided by the State to the general public.

      B.     <u>Claims of the Plaintiff Class</u>

The Court also finds the evidence in this case to prove as a matter of law that the Plaintiff Class has been denied meaningful access to the State's mental health care services as a result of multiple failures on the part of Defendants to reasonably accommodate the needs of the deaf.  As stated in the Background section, <u>supra</u>, Plaintiffs allege four institutional failures on the part of the State to make its mental health care services available to the Plaintiff Class.  These alleged failures are as follows: (1) lack of ASL-fluent mental health care practitioners; (2) failure to reimburse medical providers for interpreting services; (3) failure to provide deaf-appropriate group home care settings; and (4) refusal to provide adequate funding for deaf services.

As a threshold matter, and in light of the Court's specific findings detailed below, the Court need not address whether the State's allegedly disproportionate funding of deaf services alone constitutes a violation of the

ADA.  On the contrary, the Court is of the opinion that so long as the State's

services are made equally, meaningfully available to deaf consumers, the fact

that the level of funding is not proportional to spending on other programs is

not material. <u>See, e.g.,</u> <u>Concerned Parents</u>, 846 F. Supp. at 992 n.14

("[D]isparate funding, in and of itself, would not violate the ADA *if* the City

could show that what remained of the City's Department of Leisure Services

sufficiently gave individuals with disabilities equal access to the benefits of the

City's recreational program.").  In light of the Court's findings of specific

failures on the part of the State to make its services meaningfully available to

deaf consumers, the Court need not consider the funding issue, which

necessarily will be addressed in the remedy phase of this action.  The Court

considers the three remaining institutional failures alleged, in turn.

> 1. *Failure to Provide Deaf-Appropriate Group Home Care*

The Court considers first the alleged failure on the part of the State to

provide deaf-appropriate group home care services, as this was discussed

extensively in connection with the individual claims of Belton and Erickson.

As stated above, the Court finds sufficient evidence to show that the State's

group homes are not equipped to accommodate deaf consumers.  The State's

32

representative, Dr. Critchfield, testified that group home living is therapeutically ideal for deaf consumers who suffer from mental and developmental disabilities. He further testified, however, that group home living is therapeutically effective for deaf residents only if there is a two-way flow of communication between the residents and the staff. This requires staff who are able to communicate with deaf persons through their primary language, ASL. Given the State's shortage of ASL-fluent individuals to staff the group homes, Dr. Critchfield testified that the State currently faces a severe shortage of community living arrangements designed to accommodate the needs of the deaf.

The Court finds that Defendants have offered no evidence to rebut this showing. Defendants do not argue that any of the State's group homes can accommodate the communication needs of deaf consumers, nor have Defendants presented evidence that a single deaf consumer has been able to locate a State-provided group home that could do so. In light of the Plaintiffs' showing that the State's group homes are not suitable for deaf consumers, the Court finds that Defendants have failed to make its mental health care services equally available to deaf consumers as to the general public.

33

2.      *ASL-Fluent Mental Health care Practitioners*

The Court also finds that the State has failed to provide deaf consumers

with equal access to its mental health care services given the State's shortage of

ASL-proficient mental health care practitioners.  Defendants do not dispute that

the State faces a severe shortage of ASL-proficient practitioners; indeed, much

of Plaintiffs' evidence to this end comes from the testimony of Defendants'

representatives, Drs. Critchfield and Bliss.  In particular, as set out in detail in

the Background section, <u>supra</u>, Drs. Critchfield and Bliss testified that the State

has a severe shortage of ASL-fluent clinical workers, which, according to Dr.

Critchfield, is the result of a lack of State resources and institutional

infrastructure.

Both individuals further testified that this shortage of ASL-fluent

practitioners is a barrier to deaf consumers receiving adequate mental health

care.  Critchfield and Bliss testified that communication between patient and

practitioner is central to the provision of mental health care, and that for a deaf

consumer to effectively communicate with the practitioner, the practitioner

must be proficient in ASL.  These experts further testified that the State's

current reliance on interpreters to act as intermediaries between deaf consumers

34

and hearing practitioners is an inadequate substitute for ASL-fluent

practitioners.  Most importantly, Dr. Critchfield testified that communication

between a deaf patient and hearing practitioner, aided by an interpreter, is not

equal to communication between a hearing patient and a hearing practitioner.

As stated above, Defendants do not dispute this evidence.  Instead,

Defendants argue that the State's lack of mental health care practitioners fluent

in ASL does not violate the ADA because the ADA does not require the State to

use such practitioners in its delivery of mental health care to deaf consumers.

(Defs.' Resp. to Pls.' Mot. for Partial Summ. J., Dkt. [99] at 16-19.)  On the

contrary, Defendants argue, the use of qualified interpreters is sufficient under

the plain language of the ADA.  (Id.)

In support of this argument, Defendants rely on a provision of the ADA's

governing regulations regarding a public entity's obligation to effectively

communicate with disabled persons.  Under 28 C.F.R. § 35.160(a)(1), "[a]

public entity shall take appropriate steps to ensure that communications with

applicants, participants, members of the public, and companies with disabilities

are as effective as communications with others."  In this regard, the regulations

require public entities to "furnish appropriate auxiliary aids and services where

35

necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." Id. § 35.160(b)(1). "Auxiliary aids and services" is defined as "including" "qualified interpreters." Id. § 35.104. Based on these provisions, Defendants argue that the ADA does not require the State to use ASL-fluent practitioners, only qualified interpreters.

The Court again finds Defendants' argument regarding the requirements of the ADA to miss the point. First, Defendants' reliance in this case on the "communications" provision of the ADA's regulations is misplaced, as this case is not about the State's communications with deaf persons but, rather, the State's overarching obligation to ensure that the mental health services it provides to the general public are equally available to persons who are deaf. In other words, Plaintiffs' claims implicate the core of the ADA's regulations–the "General prohibitions against discrimination," found in Section 35.130(b)(1), as set forth above. Whether the State's mental health care services are equally available to deaf consumers as they are to the general public–the issue in this case–is a separate question from whether the State has provided an effective means of communicating with deaf consumers of the State's services.

Second, Defendants' argument that the "Communications" regulation plainly does not require ASL-fluent practitioners is incorrect.  The regulation requires public entities to ensure that communications with disabled persons are "as effective as" communications with others.  To this end, public entities are required to provide disabled persons with "auxiliary aids and services" where necessary to ensure equally effective communication.  Thus, the auxiliary aid or service must be selected with an eye toward ensuring equally effective communication.  Accordingly, while the regulations define "auxiliary aids or services" to *include* "qualified interpreters," the use of a qualified interpreter would not necessarily satisfy the State's obligation to ensure equally effective communication with deaf persons.

Finally, Defendants' argument that the ADA's "Communications" provision does not require the State to deliver mental health care to deaf consumers through ASL-fluent practitioners, but rather is satisfied by the use of interpreters, fails on the merits.  As stated above, Defendants have not rebutted Plaintiffs' evidence that the use of interpreters to deliver mental health care services to deaf consumers is inferior to the use of ASL-fluent practitioners, and is a barrier to deaf consumers' receipt of adequate mental health care.  More

37

importantly, Defendants have failed to rebut Plaintiffs' showing that communication between deaf patients and hearing practitioners, aided by interpreters, *is not equal to* communication between hearing patients and hearing practitioners.  Thus, the evidence shows that even if the "Communications" regulation were the relevant provision in this case, the use of interpreters does not achieve "equal communication" between the State's mental health care providers and deaf consumers as that between the State's providers and hearing consumers.

In sum, Defendants have failed to produce any evidence to rebut Plaintiffs' showing that absent ASL-proficient mental health care practitioners, deaf consumers, because of their deafness, cannot derive the same benefit from the State's mental health care services as that afforded to the general public.

3.    *Failure to Reimburse for the Cost of Interpreters*

Finally, the Court finds that Plaintiffs have produced sufficient evidence that the State's failure to reimburse health care providers for the cost of interpreters disincentives practitioners from serving deaf consumers, thereby exacerbating deaf consumers' lack of access to the State's mental health care services.  As set out in the Background section, supra, the evidence in this case

38

shows that interpreters are not an adequate substitute for the use of ASL-fluent practitioners in the delivery of mental health care to deaf consumers. It also shows, however, that given the current shortage of ASL-fluent practitioners, the State relies almost exclusively on interpreters and that, under certain circumstances, interpreters are necessary. Despite the fact that interpreters are a necessary ingredient of the State's provision of mental health care services to deaf consumers, Drs. Bliss and Critchfield both testified that the State does not reimburse medical providers for the cost of these services. They further testified that this creates a strong disincentive for practitioners to accept deaf patients.

On the contrary, and as stated in the Background section, supra, Defendants argue that DBHDD does reimburse for the costs of interpreters by adding to its health care providers' service contracts an extra 5% payment, which providers can use to cover the costs of interpreters. Plaintiffs contend that this 5% payment is not an accommodation for deaf consumers but rather the service provider's profit margin. (Pls.' Reply in Supp. Mot. for Partial Summ. J., Dkt. [106] at 5 of 16.) Indeed, Audrey Sumner of DBHDD testified that if a provider does not spend the 5%, the provider is entitled to retain it.

39

The Court agrees with Plaintiffs that this 5% payment looks more like a profit margin than an effort by the State to reimburse providers for the cost of interpreter services, in light of the deposition testimony of DBHDD's Audrey Sumner.  Construing the facts most favorably to Defendants, however, the Court accepts that there is factual dispute regarding whether this 5% payment is intended to reimburse health care providers for interpreters' services. Nonetheless, this factual dispute is insufficient to rebut Plaintiffs' showing that practitioners currently are not reimbursed by the State for the cost of interpreters and thus are incentivized not to take deaf patients.

In particular, Defendants have put forward no evidence that practitioners actually use the 5% payment to cover the cost of interpreters, rather than retaining it as profits, or that the 5% payment is an amount sufficient to do so. Nor do Defendants put forward any evidence to rebut the testimony of Drs. Bliss and Critchfield, DBHDD's own representatives, that health care providers–rather than the State–shoulder the costs of interpreters, giving practitioners a disincentive to care for deaf consumers.  The Court thus finds sufficient evidence to show that the State's failure to reimburse health care

40

providers–either wholly or in part–is another way in which the State fails to

make its mental health care services meaningfully available to deaf consumers.

In sum, Plaintiffs have produced sufficient evidence to prove as a matter

of law that deaf consumers, because of their deafness, and as a result of several

institutional failures on the part of the State, are denied meaningful access to the

mental health care services provided by the State to the general public.  The

Court also notes that Defendants have never argued, nor put forward any

evidence to show, that accommodations reasonably cannot be made to correct

these institutional failures.  Accordingly, Plaintiffs are entitled to judgment as a

matter of law on the issue of Defendants' liability under Title II of the ADA and

Section 504 of the Rehabilitation Act.

## Conclusion

In accordance with the foregoing, the Court hereby **GRANTS** Plaintiffs'

Motion for Summary Judgment on the Issue of Liability [88].  The crafting of

an appropriate remedy still must be accomplished.  Many of the points asserted

by Defendants in response to the Motion for Summary Judgment may bear on

the decision regarding remedies.  The Court is convinced that a remedy that

appropriately addresses the shortcomings that the Court has found exist can best

AO 72A
(Rev.8/82)

be developed through a collaborative effort by the Parties.  To that end, it is

hereby **ORDERED** that the case be **REFERRED** to Chief Magistrate Judge

Janet F. King for assignment to Magistrate Judge for mediation regarding the

proper remedy in this case.

      **SO ORDERED**, this  _30th_  day of March, 2012.


                                                  **RICHARD W. STORY**
                                                United States District Judge

AO 72A
(Rev.8/82)