IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

RENITA BELTON and                   :
MATTHEW ERICKSON on                 :
behalf of themselves and all those  :
similarly situated,                 :
                                    :        CIVIL ACTION NO.
        Plaintiffs,                 :        1:10-CV-0583-RWS
                                    :
v.                                  :
                                    :
STATE OF GEORGIA, et al.,           :
                                    :
        Defendants.                 :

## ORDER

I.      Introduction

        A.      On March 3, 2010, Plaintiffs Renita Belton and Matthew Erickson,

                on behalf of themselves and all those similarly situated, brought

                this action pursuant to Title II of the Americans with Disabilities

                Act ("ADA"), 42 U.S.C. § 12101 et seq., and Section 504 of the

                Rehabilitation Act ("Section 504"), 29 U.S.C. § 701 et seq.,

                alleging that Defendants failed to provide Deaf Georgians access to

                state-provided behavioral health and developmental disability

                services equal to that afforded to non-Deaf Georgians.  (Compl.,

AO 72A
(Rev.8/82)

Dkt. [1].)

B.    On March 14, 2011, the Court certified this case as a class action on behalf of "[a]ll deaf Georgia citizens who are, or will be in need of public mental health services, but who cannot receive therapeutic benefit from said services due to the Georgia Department of Behavioral Health and Development Disabilities' lack of accommodations for the Deaf."  (Order, Dkt. [82] at 1.)

C.    Plaintiffs subsequently filed a Motion for Summary Judgment on the issue of Defendants' liability under Title II of the ADA and Section 504 (Dkt. [88]), which the Court granted by Order dated March 30, 2012 (Dkt. [115]).  After finding Defendants liable under the ADA and Section 504, the Court referred the case to mediation concerning the issue of a remedy, reasoning that an appropriate remedy would best be developed through a collaborative effort by the Parties.  (Order, Dkt. [115] at 41-42.) Mediation, however, was not successful.

D.    Following the Parties' failed attempts to craft a remedy through mediation, the Court appointed Mr. Roger Williams to serve as

Monitor and Independent Expert ("Monitor") to assist the Court and the Parties in the development of a remedial order and its implementation.  (Order, Dkt. [166].)  Mr. Williams (hereinafter "the Monitor") was charged with developing a comprehensive remedial plan to recommend for the Court's consideration.  (Id. at 2-3.)

E.     On April 18, 2013, the Monitor submitted to the Court and the Parties a proposed remedial order.  The Parties submitted comments to the proposed remedial order to the Court.  Having reviewed the proposed remedial order prepared by the Monitor and the Parties' comments thereto, the Court hereby enters this Order, which serves to remedy Defendants' violations of the ADA and Section 504.

## II.     Definitions

As used in this Order, the following definitions apply to the terms below, without regard to case, gender, tense, or number:

A.     "American Sign Language fluent" or "ASL fluent" is defined as the ability to achieve a score of "Advanced" or "higher" on the

3

Sign Language Proficiency Interview ("SLPI") developed by the National Technical Institute for the Deaf ("NTID"), or its equivalent, by raters trained and approved by the National SLPI: ASL Leadership Board.

B.     A "Deaf" person is one whose hearing is totally impaired or whose hearing is so seriously impaired as to prohibit the person from understanding oral communications spoken in a normal conversational tone (O.C.G.A. § 30-1-1).  In general, this will entail a unilateral or bilateral hearing loss of greater than 70dB in the better ear.  A "Deaf" person is also one who has been partially or totally unable to hear since birth or childhood, and/or one who is currently partially or totally unable to hear, and relies on a non-verbal modality, such as American Sign Language ("ASL"), as their primary mode of communication.  This can be a self-identified classification regardless of the severity of the hearing loss.

C.     The "State" shall mean the State of Georgia.

D.     The "Department" shall mean the Georgia Department of

4

Behavioral Health and Developmental Disabilities.

E.   "Developmentally Disabled" is defined as set forth in the waiver and Department policy for state funding of developmental disability services:

i.   Intellectual disability and/or related conditions, where a related condition is a severe, chronic disability that meets all of the following conditions:

1.   It is attributable to:

a.   Cerebral palsy or epilepsy; or

b.   Any other condition, other than mental illness, found to be closely related to an intellectual disability because this condition results in impairment of general intellectual functioning or adaptive behavior similar to that of persons with intellectual disability, and requires treatment or services similar to those required for these persons; and

2.   It is manifested before the person reaches age 22; and

5

3.    It is likely to continue indefinitely; and

4.    It results in substantial functional limitations in three or more of the following areas of major life activity:

a.    Self-care;

b.    Understanding and use of language;

c.    Learning;

d.    Mobility;

e.    Self-direction;

f.    Capacity for independent living.

F.    A "Provider" is an organization or person approved to serve persons with mental illness, and/or developmental disabilities, wherein those services are financially supported in whole or in part by funds authorized through the Department.  A Provider typically has a contract or letter of agreement or other legal or funding arrangement with the Department.

G.    A "Mental Health Interpreter" or "MHI" is a person who:

i.    Possesses the National Interpreter Certification (NIC), as either a generalist or a specialist, as defined by the National

6

Association of the Deaf and the Registry of Interpreters for the Deaf (NAD/RID) (or an equivalent certification process, such as CI/CT or NAD 5), that is approved by the NAD/RID; and,

ii.   Has attended at least thirty hours of mental health interpreter training administered by a state-operated agency or a nationally recognized mental health interpreter training program.

iii.   A "certified MHI" is an MHI who, in addition to completing the training specified above, has completed a structured mentoring experience and knowledge exam, as administered by a state-operated agency or a nationally recognized mental health interpreter training program.

H.   A "Visually Accessible Host Home" is "a private residence in a residential area in which the occupant owner or lessee provides housing and provides or arranges for the provision of food, one or more personal services, supports, care, or treatment exclusively for one or two persons who are not related to the occupant owner or

7

lessee by blood or marriage," O.C.G.A. § 37-1-20(18), and in which visual communication is used.

I.   A "Visually Accessible Community Residential Alternative Group Home" is a residential home occupied by up to four Developmentally Disabled persons who use a visual communication method including American Sign Language, Pidgin Signed English, Manually Coded English, Visual-Gestural Communication or tactile variations thereof and require intense levels of support that include a range of individually planned and tailored interventions with a particular focus on training and support in one or more of the following areas: eating and drinking, toileting, personal grooming and health care, dressing, communication, interpersonal relationships, mobility, home management, and the use of leisure time.

III.   Substantive Provisions

A.   General

i.   The following provisions set out the requirements the State must meet in its provision of behavioral health and

8

developmental disability services to persons who are deaf

and otherwise qualify and are approved for such services.

ii. The State may choose to provide the services set out in this

Order directly through the Department or through a

community-based Provider network, provided the

requirements of this Order are fully satisfied.

B. Office of Deaf Services

i. The State shall maintain the Office of Deaf Services

("ODS") within the Department.  ODS will have statewide

oversight of the Department's provision of behavioral health

and developmental disability services to persons who are

deaf and otherwise qualify for and are approved for such

services.  Said services will be provided in compliance with

Title II of the ADA and Section 504.

ii. The Department shall continue to fund and fill the full-time

position of Director of Deaf Services ("Director") to manage

and direct ODS.  Due to the breadth of services Deaf persons

must access, it is preferable that this position report directly

9

to the Deputy Commissioner.  At a minimum, the position must report directly to the Associate Commissioner for behavioral health services.

1.     The minimum qualifications for this position shall be a clinical master's degree in a human services field such as psychology, counseling, or social work; a minimum of three years management experience in deaf services program design, implementation, management, and evaluation; or a clinical doctoral degree with at least two years related experience, as above.  The Director must be ASL fluent, have a working knowledge of deaf culture and systems theory, with actual experience in managing clinical staff, and possess the ability to prepare written correspondence and documents in English.

2.     The Director's responsibilities will include policy development, budget oversight, program design and overall responsibility for the implementation of this

10

Order.  Specifically, the Director will be vested with the express authority to design and implement the remedial plan outlined herein, and to regularly evaluate the Department's various programs of services provided to persons who are Deaf, including adults with severe mental illness, children/adolescents with serious emotional disturbances, adults and adolescents with addictive disease and Developmental Disabilities.

iii.   The Department shall also employ a full-time Community Service Coordinator ("CSC") to work under the direct supervision of the Director.  The CSC will be responsible for statewide coordination of all services provided by the Department to persons who are Deaf.

1.   The minimum qualifications for the CSC position shall be a master's degree in a human services field such as psychology, counseling, or social work, with at least two years management experience in deaf

11

services program design, implementation, management and evaluation; or a doctoral degree with at least one year related experience.  The CSC shall be ASL fluent, and have a working knowledge of deaf culture and systems theory.  Ideally, this person shall hold a clinical license and be trained to assist with clinical supervision.

iv.    The Department shall employ a full-time Communication Access/Sign Language Interpreter Coordinator ("Interpreter Coordinator") to work under the supervision of the Director. The Interpreter Coordinator shall coordinate interpreter services statewide in all Department programs and services.

1.    The minimum qualifications for this position are that the individual shall be a Mental Health Interpreter and have a Bachelor's degree in Interpreting, Linguistics, Deaf Studies, Psychology, Sociology or a related human services field, plus three years or more of paid experience interpreting in a variety of settings.

12

Ideally, this individual should be a certified MHI.

C.   Establishment of Regional Offices—Over a period of five years,
starting with the effective date of this Order, the Department shall
incrementally establish six regional Deaf Services offices, one in
each of the Department's regions.  In regions which have a
population of at least 1,000,000 but less than 2,000,000, each
office shall employ on a full-time basis at least one Adult Services
Specialist, one Case Manager, one Service Coordinator for the
Developmentally Disabled, one Peer Support Specialist (PSS), and
one staff interpreter.  Regions serving a population of 2,000,000 or
more shall have twice the number of Full-Time Equivalent (FTE)
staff.  Regions serving a population less than 1,000,000 may be
staffed with a proportionately smaller number of FTE staff.  These
employees must be ASL-fluent.  The staff interpreter shall be a
Mental Health Interpreter.

   i.   These offices shall provide direct services, coordinate the
provision of accessible behavioral health and developmental
disability services and provide technical assistance to

13

Providers in the provision of services.  Direct service provision may include the use of telemedicine on a limited basis when appropriate for particular persons in remote locations or urgent situations.

D.     The Department will ensure that a communication assessment shall be completed on all clients of the Department who are Deaf.  At a minimum, such an assessment shall include documentation by an ASL-fluent professional of the client's language of preference; the client's competence in English and their language of preference, if different; and what accommodations are needed for communication.  When a client is not fully competent in their language of preference, a complete assessment will be completed by an ASL-fluent professional.  The assessments shall be based on instruments similar to those currently employed by the South Carolina Department of Mental Health or the Alabama Department of Mental Health.  These assessments will be completed on all new clients served by the Department or Provider, starting within six months of the effective date of this Order.  Existing clients shall

14

have this information collected within two years of the effective date of this Order.

E.      The Department will ensure that its consumer database identifies the hearing status and language preference of every individual being served by the Department and Providers.  This information will be obtained on all new clients served by the Department or Provider, starting within six months of the effective date of this Order.  Existing clients shall have this information collected within one year of the effective date of this Order.

F.      The Department will conduct a study to identify all current Deaf patients currently housed in hospitals operated by the Department, to be completed no later than six months after the effective date of this Order.  These patients will be assessed by ASL-fluent professionals to determine the appropriateness of their hospitalization.  The assessments shall include a communication assessment based on instruments similar to those currently employed by the South Carolina Department of Mental Health or the Alabama Department of Mental Health.  These assessments

will evaluate patient needs and develop discharge and/or treatment plans needed to facilitate the transition of those patients who are deemed ready for discharge into community or other therapeutic settings.

G.    The Department will ensure that all Deaf patients committed to state hospitals will have access to linguistically accessible services equivalent to those provided to hearing patients.

    i.    This may require that specific facilities be identified which can provide accessible services for differing populations including persons with a Developmental Disability, forensic populations and psychiatric services.

    ii.    The provisions in III.F. and III.G. shall in no way alter the State's obligations under the Settlement Agreement entered into by and between the State and the United States of America in United States of America v. State of Georgia, No. 1:10-cv-249-CAP (N.D. Ga. Oct. 19, 2010).

H.    Residential Services

    i.    Within four years of the effective date of this Order, for

16

Deaf, Developmentally Disabled persons receiving waiver funded community residential services, the Department, through the joint efforts of ODS staff and the LEPSI facilitators in each region, will facilitate the host or group home living arrangement the Deaf, Developmentally Disabled person chooses through the informed choice process.  This shall include Visually Accessible Host Homes and Visually Accessible Group Homes (CRAGH), as defined in II.H. and II.I.  To facilitate said choice, the Department will create a "special requests" database accessible by ODS staff, the LEPSI facilitators, and other individuals responsible for planning and coordination.  This database will be HIPAA compliant, therefore protecting private health information.

ii.    The approval process for waiver funded community residential services for Deaf, Developmentally Disabled persons shall remain in accord with the model the Department uses for all Developmentally Disabled persons

17

receiving waiver funded community residential services, as
defined in the waiver.

iii.   To facilitate the planning and implementation of
individualized accommodations for Deaf, Developmentally
Disabled persons receiving waiver funded community
residential services, an assessment of the nature and extent
of the persons' disability and mode of communication will
be completed in connection with the development of the
Individual Service Plan.  The assessment shall include
determination of any physical and cognitive limitations that
impact the use of visually accessible technologies and
equipment.  The assessment shall also include the review of
visual telecommunications technologies (such as TTY/TDD
or videophone), visual fire alarms, visual doorbells and a
visual intercom system at the main entrance.  The Individual
Service Plan will specify the findings of the assessment, to
include the Deaf, Developmentally Disabled person's mode
of communication and individualized accommodations.  The

18

caregivers in the host or group home chosen by the Deaf,

Developmentally Disabled person, and into which said

person is accepted, shall use the mode of communication of

said person and the home must be equipped with the

individualized accommodations, set forth in the Deaf,

Developmentally Disabled person's Individual Service Plan.

iv.     The Department will collaborate with the Georgia

Association of the Deaf and other organizations committed

to advocating for Deaf persons to recruit providers for Deaf,

Developmentally Disabled persons receiving waiver funded

community residential services who make the informed

choice to live in a host or group home.

v.      On an annual basis, the Monitor will provide the Court a

report assessing Defendants' progress toward compliance

with the foregoing provisions governing residential services.

I.      Service Coordination

i.      For all persons identified as Deaf and having a

Developmental Disability, Individual Service Plans must be

developed with the assistance of the ODS regional staff. Ideally, as staff members are available, this would mean that the regional specialist for Developmental Disabilities will be present at the meeting when the service plan is developed.

ii.   The client, and guardian when so appointed, shall be informed of the availability of visually accessible residential programs and of visual accommodations which could be provided under the community living support program.

J.   Mental Health Services

i.   Within two years of the effective date of this Order, twenty-five percent (25%) of the non-crisis-related outpatient mental health therapy or counseling services provided to Deaf persons by the Department or Providers will be provided by ASL-fluent clinicians, either the ODS staff described in III.C. or ASL-fluent staff of a Provider.  Within three years, this shall increase to forty-five percent (45%), and in four years to eighty percent (80%).  When no ASL-fluent clinician is available, or when so requested by the

20

client, services may be provided with the assistance of a

MHI.

K.     Crisis Services

i.     Within six months of the effective date of this Order,

Providers of crisis services must develop plans for how they

will make their services accessible to Deaf persons.  This

shall include ODS staff in regions where there are an

insufficient number of Providers with ASL-fluent staff to

meet the demand for crisis services.  All plans shall include

ASL-fluent staff and MHIs.

IV.   Public Information Program

A.     Within one year of the effective date of this Order, the Department

shall provide information about the availability of the services

specified in this Order.  At a minimum, this information will be

provided to:

i.     Current clients of the Department;

ii.    Providers;

iii.   Community and consumer organizations serving the Deaf

communities; and

iv.    The general public through other information provided by the Department describing all services available.

B.    Such information will be available in standard written English, written English using a vocabulary and grammar no higher than the 6th grade, and in American Sign Language, as is appropriate to the target audience.

V.    Staff Development

A.    Peer Support Specialist

i.    Within two years of the effective date of this Order, there shall be five Deaf Certified Peer Support Specialists, either employed by the Department or employed by a Provider. Within three years, there shall be ten and fifteen within four years.

B.    Mental Health Interpreters

i.    Within two years of the effective date of this Order, the Department and/or Providers shall have at least thirty persons who are approved as Mental Health Interpreters,

22

under contract or employed to provide sign language

interpreting services.  Within three years, and on an ongoing

basis, forty persons who are approved as Mental Health

Interpreters shall be under contract or employed to provide

sign language interpreting services.

ii.     Within two years of the effective date of this Order, the

Department shall have at least two individuals who are

approved as Mental Health Interpreter Supervisors, by the

Alabama Department of Mental Health or equivalent, either

employed or in a contractual arrangement, able to provide

supervision to MHIs completing the mentoring requirement

of certification.

iii.    Within two years of the effective date of this Order, the

Department and/or Providers shall have at least ten persons

who are certified as Mental Health Interpreters, as defined in

II.G.iii, under contract or employed to provide sign language

interpreting services.  Within there years, and on an ongoing

basis, fifteen persons who are certified as Mental Health

AO 72A
(Rev.8/82)

Interpreters shall be under contract or employed to provide

sign language interpreting services.

    iv.    The Monitor shall have the authority to modify the

requirements of V.B. based on the actual utilization of

Interpreters.

C.    Sign Language Instruction

    i.    The Department shall provide sign language instruction for

those Providers where persons who use sign language or, in

the case of persons with severe language deficits, would

benefit from sign language exposure, are present for more

than two hours a day at least two days a week.  This would

include, but is not limited to, Prevocational programs and

intensive outpatient programs.

    ii.    At a minimum, this instruction should be provided until one-

half working with Deaf persons are able to communicate at

the "Survival" level of ASL proficiency, as defined by the

SLPI.

VI.    Reimbursement for Interpreter Services

AO 72A
(Rev.8/82)

A.   When a staff interpreter is not available, and a Provider provides behavioral health or Developmental Disability services to a Deaf person, the Department shall pay for the interpreting services necessary to deliver those services separate and apart from the contract for the behavioral health or Developmental Disability services themselves.

B.   Except as specifically authorized by a staff member of the Office of Deaf Services, only Mental Health Interpreters will be eligible for payment.  Such exceptions must identify the specific language needs which could not be met by a Mental Health Interpreter.

C.   Within thirty days of the effective date of this Order, the Department shall develop a tiered payment structure for sign language interpreters.  Such a tiered rate will differentially compensate interpreters who are (1) Mental Health Interpreters, as defined in II.G. above and (2) certified as Mental Health Interpreters, as defined in paragraph II.G.iii.

VII.   Requirements Applicable to Providers

A.   The requirements of this Order which apply to Providers will be

25

incorporated into the Service Standards of the respective Provider Manuals of the Department with eighteen months of the effective date of this Order.

VIII.   Responsibilities and Authority of the Monitor

    A.   The Monitor shall be responsible for overseeing implementation and compliance with the terms of this Order, in accordance with the terms of the Court's Order appointing the Monitor (Dkt. [166] at 3-4).

    B.   The Monitor shall also have the authority to seek judicial intervention and direction, when necessary, to ensure compliance with the terms of this Order.

**SO ORDERED**, this  18th  day of June, 2013.

**RICHARD W. STORY**
United States District Judge

26