UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| RENITA BELTON and MATTHEW ERICKSON, individually and as Class Representatives, <br><br> Plaintiffs, <br><br> vs. <br><br> STATE OF GEORGIA, et al., <br><br> Defendants. | Civil Action File No. <br><br> 1:10-CV-0583-RWS |

**CONSENT ORDER**

I. **Introduction**

Plaintiffs Renita Belton and Matthew Erickson, on behalf of themselves and all those similarly situated, brought this action pursuant to Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 701 *et seq.* (Compl., Dkt. [1].) The Court certified the case as a class action. (Order, Dkt. [82] at 1.) Plaintiffs filed a Motion for Summary Judgment seeking injunctive relief for themselves and the class on the issue of Defendants' liability under Title II of the ADA and Section 504 (Dkt. [88]), which summary judgment motion was granted in part. (Dkt. [115]). The Court appointed Roger Williams to assist the Court and the parties in the development of a remedial order and monitor implementation of that order. (Order, Dkt. [166].) The Court then entered a

remedial Order. (Dkt. [172]). Defendants filed a Notice of Appeal of the order granting class certification, the order granting partial summary judgment and the remedial order. (Dkt. [185].) Defendants' appeal was argued before the United States District Court for the Eleventh Circuit. The Eleventh Circuit subsequently entered an order referring the appeal to mediation. (Case No. 13-13316, Order of April 11, 2014.)

The parties engaged in lengthy negotiations, discussions, and several mediation sessions. Monitor Williams participated in those mediation sessions and other related discussions. While Defendants deny liability, the present consent order is a result of that mediation process and resolves Plaintiffs' claims for injunctive relief, individually and on behalf of the class, against Commissioner Frank Berry, in his official capacity as Commissioner of the Georgia Department of Behavioral Health and Developmental Disabilities. The consent order does not resolve or address any claims for damages.

II. **Definitions**

As used in this Order, the following definitions apply to the terms below, without regard to case, gender, tense, or number:

A. *Deaf Class Members* – Deaf individuals (1) eligible for or receiving state-funded services for mental illness, including in state hospitals; or (2) Deaf individuals awarded Comprehensive Supports Waiver Program ("COMP") funding.

B. *D/MI Class Members* – Deaf individuals eligible for or receiving state funded services for mental illness, including in state hospitals, who need non-crisis related therapy or counseling services provided by ASL fluent therapists or counselors or through the use of interpreters.

C. *D/DD Class Members* – Deaf individuals awarded COMP funding.

D. *American Sign Language fluent* ("*ASL-fluent*") – The ability to achieve a score of "Advanced" or higher on the Sign Language Proficiency Interview ("SLPI") or its predecessor, the Signed Communication Proficiency Interview ("SCPI").

E. *Deaf individual* -- Any individual whose hearing is totally impaired or whose hearing is so seriously impaired as to prohibit the individual from understanding oral communications spoken in a normal conversational tone. This can be a self-identified classification regardless of the severity of the hearing loss or mode of manual communication preferred.

F. The *State* -- The State of Georgia.

G. The *Department* or *DBHDD* -- The Georgia Department of Behavioral Health and Developmental Disabilities, or successor department or agency of the State of Georgia.

H. *Developmentally Disabled* – An individual with an intellectual disability and/or a related condition as those terms are used in 42 C.F.R. § 435.1010.

I. *Provider* -- An organization approved by DBHDD to serve individuals with mental illness and/or developmental disabilities and which has a contract or letter of agreement or other legal funding arrangement with DBHDD.

J. *Designated Providers* ("*DP*") – Designated community service boards ("CSB") with which DBHDD contracts to provide state funded services for mental illness specifically targeted to D/MI class members. Each county in the State will have at least one (1) DP designated to provide services for D/MI class members residing in that county. A minimum of six (6) DPs will be designated state-wide to provide services for Deaf D/MI class members.

K. *Qualified Interpreter* -- An interpreter who has:

    1. A current national certification as a sign language interpreter as awarded or honored by the Registry of Interpreters for the Deaf, Inc.;

    2. Attended at least forty (40) hours of mental health interpreter training administered by a state-operated agency or a nationally recognized mental health interpreter training program; and

    3. Verification of participating in at least forty (40) hours of a practicum as approved by DBHDD's Deaf Services office.

L. *Communication Accessible Host Home* -- A host home as defined in O.C.G.A. § 37-1-20(18), occupied by one or two D/DD Class Member(s) and staffed according to the needs identified in the D/DD Class Member's communication assessment that is

incorporated into the Individual Service Plan ("ISP").

M. *Communication Accessible Group Home* – A waiver funded group home occupied by one to four D/DD Class Members that is staffed according to the needs identified in the D/DD Class Members' communication assessments that are incorporated into the ISPs.

III. **Substantive Provisions**

A. *Deaf Services Office*

1. DBHDD shall maintain a Deaf Services office ("DS"). DS will have statewide monitoring and management of the provision of services to Deaf individuals covered by this Order.

2. DBHDD shall employ a full-time DS Director ("Director") who reports to a director or executive level position that has responsibility for disability program services. The Director must be ASL-fluent, have a working knowledge of deaf culture, and have at least four (4) years of administrative experience in human services, healthcare administration, or related field, or a Ph.D. in the aforementioned fields in lieu of such experience.

3. DBHDD shall also employ a full-time Community Service Coordinator ("CSC") to work under the direct supervision of the Director. The CSC will be responsible for statewide coordination of all services provided to Deaf Class

Members by DBHDD directly or through its provider network. The minimum qualifications for the CSC position shall be a master's degree in a human services field such as psychology, counseling, education or social work, with at least two (2) years of experience in deaf services delivery. The CSC shall be ASL-fluent and have a working knowledge of deaf culture and, preferably, systems theory. Ideally, the CSC shall hold a clinical license and be trained to assist with clinical supervision.

    4. DBHDD shall employ a full-time Interpreter Coordinator ("IC") to coordinate interpreter services for Deaf individuals covered by this Order. The IC shall be a QI.

    5. DS will provide monitoring of the provision of services to Deaf individuals covered by this order as follows:

        i. All CSBs will be required starting within six (6) months of the effective date of this order to notify DS within two (2) business days of initial intake of a Deaf individual.

        ii. DS will conduct random samples of Deaf individuals covered by this Order to ascertain the provision of and access to appropriate accommodations;

        iii. DS will assist the Office of Constituent Services ("CS") in the "Complaints and Grievances Regarding Community Services" process set

forth in DBHDD Policy No. 19-101; and

  iv. DS will refer to CS all complaints made directly to DS and coordinate with CS as needed in compliance with that office's guidelines.

B. *Services for Deaf Class Members*:

 1. <u>Communication Assessments</u>

  i. Communication assessments will be completed for Deaf Class Members in connection with their entering non-crisis services;

  ii. Communication assessments will be completed for Deaf Class Members already approved for non-crisis services or awarded funding for COMP services within three years of the effective date of this Order.

  iii. The communication assessment results shall include (but are not limited to):

   a. Determination of any communication limitations;

   b. Associated reasonable accommodations; and

   c. Recommendations for type of appropriate and accessible group and host home staffing requirements.

  iv. Communication assessors are qualified to do communication assessments if they:

   a. Hold Superior (preferred), or Advanced Plus level on SLPI or similar qualification as defined in this Order;

    b. Are a clinician, qualified interpreter or visual gestural language specialist approved by DS; and

    c. Have completed DS provided or approved training in conducting communication assessments.

  v. A copy of all communication assessment reports will be maintained in the DS office. For each new communication assessor, the first ten reports will be reviewed by DS for assessment accuracy and appropriateness of the recommendations. Ongoing monitoring for quality will occur as part of annual performance reviews or more frequently as needed based on the skill level and experience of the assessor.

2. <u>Databases</u>

Consumer databases will identify the hearing status and communication preference of Deaf Class Members.

3. <u>Crisis Services</u>

Within one (1) year of the effective date of this Order, providers of crisis services will develop plans for the provision of crisis services to Deaf Class Members. These plans shall comply with DBHDD policies, as approved by the Monitor. DBHDD will require providers to comply with said plans and policies.

4. <u>State Hospitals</u>

All Deaf Class members in State hospitals will receive services, including,

but not limited to, counseling, and therapy, consistent with their communication assessment recommendations as outlined in their ISP.

C. *Services for D/DD Class Members*

    1. A communication assessment will be completed in accordance with the requirements set forth above in Section III.B.1.

    2. Upon completion of the communication assessment referenced above in Section III.B.1., the communication assessor will participate in the following ISP meeting to inform the development of the ISP and educate the D/DD Class Member and his or her circle of support about the communication results and available accommodations and appropriate/accessible host or group homes. The D/DD Class Member and his or her circle of support's informed choices will be incorporated into the final communication assessment report recommendations used to establish the ISP. DS will maintain a database of communication accessible host or group homes to provide on request at this meeting. The ISP will be used to educate potential service providers regarding implementation of the communication assessment findings. Selected providers may be contracted to address the needs of the individual as expressed in the ISP.

    3. In addition to the monitoring DS provides, as set forth above in Section III.A.5., the Support Coordinator will monitor and advocate for the D/DD Class Member, and Department staff will monitor Providers for compliance with

implementation of the ISP and, within six (6) months of the effective date of this Order, all DD Providers who provide services to a D/DD class member whose ISP requires sign language communication will have staff sufficient to meet the requirements of the ISP.

    4. The approval process for the COMP waiver for D/DD Class Members shall remain in accord with federal law and the model DBHDD uses for all developmentally disabled persons awarded COMP funding, as set forth in the waiver.

    5. DBHDD will collaborate with organizations committed to advocating for Deaf individuals to recruit Providers to serve D/DD Class Members who make the informed choice to live in a host or group home.

D. *Services for D/MI Class Members*

    1. Within thirty (30) days of the effective date of this Order, DBHDD, through its provider network, will begin providing services to D/MI Class Members through the use of ASL-fluent therapists or counselors, case managers, and/or interpreters in accordance with the D/MI Class Member's ISP. Initially, provision of services will be targeted to the geographic areas with the highest concentration of D/MI Class Members and/or in areas where there is an available ASL-fluent workforce.

2. ASL-fluent therapists or counselors will provide non-crisis related outpatient therapy or counseling services to D/MI Class Members. Services may be provided through telemedicine if in accordance with the individual's preference.

3. Within two (2) years of the effective date of this order, twenty five percent (25%) of the non-crisis-related outpatient mental health therapy or counseling services provided to D/MI Class Members by the Department or Providers will be provided by ASL-fluent therapists or counselors; within three years, forty-five percent (45%) of said services will be provided by ASL-fluent therapists or counselors, and within four (4) years, sixty percent (60%) of said services will be delivered by ASL-fluent therapists or counselors. When an ASL-fluent therapist or counselor is unavailable to provide services, DPs will coordinate for on-site or remote interpreting services utilizing a list of QI provided by DS. Nothing herein shall prevent any D/MI Class Member from continuing to receive services from their existing clinician in conjunction with a QI if that is their preference.

4. ASL-fluent case managers will provide case management services and coordinate the provision of other needed services for D/MI Class Members. Services may be provided through telemedicine provided such service delivery is the individual's preference.

5. Each DP will be required to employ or contract with ASL-fluent therapists or counselors and case managers as needed to provide services to D/MI Class Members in the DP's designated service area.

6. DBHDD will contract with DPs to pay the costs of employing or contracting with ASL-fluent therapists and/or counselors and case managers.

7. DBHDD will employ QIs or pay for QI services used by CSBs and will coordinate with CSBs to make interpretative services available as necessary.

8. DS will determine, on the basis of the request for services, if a QI is needed and will coordinate services to meet that need whenever a QI is needed. DS will use data from interpreting requests to target recruitment and training of QI in geographic areas as needed.

IV. **Public Information and Community Outreach**

DBHDD will continue to provide information about the availability of services for Deaf individuals through DBHDD's website, provider training opportunities, provider site visits, stakeholders' meetings (formerly the Deaf Advisory Council) and the Georgia Crisis and Access Line ("GCAL") website.

V. **Qualified Interpreters**

A. Within three (3) years of the effective date of this Order, and on an ongoing

basis, the Department and/or Providers shall have as many Qis under contract or employed to provide sign language interpreting services as may be necessary to fulfill requests made to DS for interpreting for counseling or therapy services covered in this order. Within three (3) years, and on an ongoing basis, the Department and/or Providers shall have at least twelve (12) Qis under contract or employed to provide sign language interpreting services.

    B. DBHDD will provide ten (10) scholarships per annum for trainees to attend a DS approved interpreter training program. If more than ten (10) potential trainees express an interest in the program, DS will select the ten (10) to be awarded the scholarships.

VI. **Responsibilities**

    A. *DBHDD*

The Department's duties regarding the provision of services covered by this Order are governed by federal and state law and federal regulations and are not altered by this Order. The provision of such services by the Department's providers shall be in accord with the contract, letter of agreement or other funding arrangement, and incorporated provider manual, between the provider and DBHDD. In addition to monitoring of providers' provision of services, the Department will take such action as necessary so that the services are provided. Nothing herein shall abrogate or diminish the Department's

duties under the ADA or Section 504.

B. *Providers*

The requirements of this Order applicable to Providers will be incorporated into the service standards of the respective provider manuals of the Department within twelve (12) months of the effective date of this Order or as soon as practicable, whichever is shorter.

C. *Monitor*

The Monitor shall be responsible for overseeing implementation and compliance with the terms of this Order, in accordance with the terms of the Court's Order appointing him. (Dkt. [166] at 3-4). The Monitor shall have the authority to seek judicial intervention, direction and modification of this Order, as necessary for compliance with the terms of this Order.

D. *Plaintiffs' Class Counsel – Fees and Expenses*

Plaintiffs' Class Counsel are entitled to recover from the Department their reasonable attorneys' fees and expenses incurred in connection with their ongoing representation of Deaf Class Members, including the enforcement and monitoring of compliance with this order and the rights of the Deaf Class Members under the ADA and Section 504. Class Counsel shall submit statements for their fees and expenses to counsel for the Department from time to time, and said statement shall be paid within thirty (30) days, except for portions that the Department may object to. The parties will

confer in good faith efforts to resolve any such objections. A motion for the award of disputed fees or expenses may be filed only if such other efforts fail.

VII. **Release**

Defendants can petition for release from the requirements in this Order within five (5) years and six (6) months of the effective date of this Order. The Court's decision whether to continue, vacate, or modify this order will be based on the consideration of all relevant factors and evidence, including whether there is a need for continued supervision to ensure compliance with the ADA and Section 504.

VIII. **Supersedeas**

This Order supersedes the Court's Order of June 18, 2013 (Dkt. [172]).

SO ORDERED, this 3rd day of October, 2014.

Agreed to by:

HON. RICHARD W. STORY
United States District Judge

/s/ David F. Walbert
DAVID F. WALBERT
A. LEE PARKS
dwalbert@pcwlawfirm.com
lparks@pcwlawfirm.com
PARKS, CHESIN & WALBERT, P.C.
75 Fourteenth Street, 26th Floor
Atlanta, GA 30309
(404) 873-8000 Telephone/(404) 873-8050 Facsimile
*Counsel for Plaintiffs*

*(Signatures to follow on Page 16)*

*/s/ Jennifer Dalton (by DFW with express permission)*
JENNIFER DALTON
Senior Assistant Attorney General
Department of Law, State of Georgia
40 Capitol Square, S.W.
Atlanta, Georgia 30334-1300
Telephone: (404) 656-0942
Facsimile: (404) 653-1062
E-mail: jdalton@law.ga.gov
*Counsel for Defendants*